SPRAGUE ELECTRIC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32629. Filed September 19, 1961.

*Hugh C. Bickford, Esq., Henry H. Elliott, Esq., Nicholas Kapnistos, Esq.,* and *Arthur G. Connolly, Esq.,* for the petitioner.

*Donald W. Geerhart, Esq., Paul G. Wilson, Esq.,* and *Irene F. Scott, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies and overassessments in income, declared value excess profits tax, and excess profits taxes for the calendar years 1941 through 1945. The petition raised 20 issues on the basis of said determinations. Issues 2 through 20 relating to adjustments of gross income and deductions have been settled and the net tax effect of such settlement has been stipulated by the parties. The deficiencies determined by respondent and the overassessments claimed by petitioner are stipulated to remain in dispute as follows:

| Year | Tax liability | Tax previously assessed | Deficiency | Overassessment |
|---|---|---|---|---|
| INCOME TAX | | | | |
| 1941 | $108,829.20 | $107,375.59 | $1,453.61 | |
| 1943 | 74,091.43 | 360,290.00 | | $286,198.57 |
| 1944 | 75,958.18 | 463,020.39 | | 387,062.21 |
| 1945 | 88,874.43 | 265,748.52 | | 176,874.09 |
| 1946 | 296,864.29 | 345,352.54 | | 48,488.25 |
| Total | 644,617.53 | 1,541,787.04 | 1,453.61 | 898,623.12 |

| Year | Tax liability | Tax previously assessed | Deficiency | Overassessment |
|---|---|---|---|---|
| DECLARED VALUE EXCESS PROFITS TAX | | | | |
| 1942 | $8,224.77 | $8,591.54 | | $366.77 |
| 1944 | 50,407.12 | 47,232.45 | $3,174.67 | |
| 1945 | 6,946.50 | | 6,946.50 | |
| Total | 65,578.39 | 55,823.99 | 10,121.17 | 366.77 |
| EXCESS PROFITS TAX | | | | |
| 1941 | $84,508.09 | $79,820.82 | $4,687.27 | |
| 1942 | 520,726.14 | 525,397.54 | | $4,671.40 |
| 1943 | 1,117,163.37 | 477,430.30 | 639,733.07 | |
| 1944 | 1,741,240.36 | 1,223,339.66 | 517,900.70 | |
| 1945 | 1,790,791.52 | 1,270,862.85 | (1) | |
| Total | 5,254,429.48 | 3,576,851.17 | 1,682,249.71 | 4,671.40 |
| Grand total | 5,964,625.40 | 5,174,462.20 | 1,693,824.49 | 903,661.29 |
| Net deficiency without regard to section 721, I.R.C. 1939 | | | | 790,163.20 |

¹ This schedule is stipulated. It appears that the figure $519,928.67 should appear at this point. We consider its absence a typographical error.

The only issue remaining for consideration is the correctness of respondent's disallowance of petitioner's claims for relief under section 721(a)(2)(C) of the Internal Revenue Code of 1939.[1]

### FINDINGS OF FACT.

Some of the facts have been stipulated. In addition, evidence in this case was presented before a commissioner of this Court. He made proposed findings of fact which were served upon the parties who made certain objections and requests for additional findings. The stipulated facts are found and the commissioner's findings of fact which were not objected to are adopted for the purposes of this opinion. Where, in our Findings of Fact we relate facts objected to or requested by the parties, our inclusion of such facts will be deemed rulings on the objections or requests without specifically noting each such objection or request.

Sprague Electric Company, hereinafter sometimes called petitioner, is a corporation incorporated under the laws of Massachusetts in June 1926 under the name of the Sprague Specialties Company, which name was changed in 1944 to its present one. Petitioner's principal office is in North Adams, Massachusetts, and its income, declared value excess profits tax and excess profits tax returns for the years here involved were filed with the collector of internal revenue at Boston, Massachusetts.

Petitioner filed timely claims for refund of excess profits tax, claiming the applicability of section 721(a)(2)(C), for each of the years 1941 through 1945.

[1] All section references herein are to the Internal Revenue Code of 1939, as amended.

During these years petitioner was an electronic components manufacturer. Its major products were condensers, resistors, and filters.

A condenser is a device for accumulating and making available a charge of electricity. In its simplest form it consists of two conducting plates separated by a nonconductor known as a dielectric. Condensers are now commonly referred to as "capacitors" [2] since the capacity of the unit to store electricity is its primary characteristic. The conducting plates are made of some conducting metal such as aluminum. The nonconductor, or dielectric, between the plates, may be simply air (a space between the plates), mica, or paper, cellophane, and other materials impregnated with oil or wax. It is also possible to utilize a thin oxide film on the surface of the conductor as the dielectric. A microfarad is the common measure of capacitance of a condenser. The metric measure of energy in a capacitor in relation to size is measured in joules.

Capacitors remained relatively unchanged from the original Leyden Jars, invented in the 17th century, until the latter part of the 19th century when crude paper-type capacitors were first constructed. During the period from 1920 until the present, great increases in voltage stress, microfarad capacity and energy density of capacitors have resulted from research and development in the electronics industry. This, coupled with the lessening in size of capacitors, known as miniaturization, has made possible electrical and electronic end products which would not otherwise have been practical or commercially feasible. The important commercial characteristics of capacitors are size, stability, and price.

Resistors are devices in which a conducting material or coil opposes the passage of current, causing the electrical energy to be transformed into heat. The selectivity of current by such devices is an essential part of most electronics equipment. There are two kinds of resistors: (1) The carbon composition resistor in which particles of carbon are compressed with an inert insulating filling material to produce a solid unit having certain resistance value. They are cheap to make and widely used; and (2) the coil or wire-wound resistor in which a conducting wire is wound around a core and the wire fixed into position by some sealer, usually ceramic in nature. These may be simple or very complicated in some applications.

In the 1920's and early 1930's the two types of resistors in common use were the carbon, or carbon pile, resistors and the vitreous enamel resistors. In the carbon type, finely pulverized carbon was mixed with binders to obtain the resistance gradients desired, and these were pressed into discs or into cylindrical pellets, or deposited on glass or ceramic materials in various configurations to get the desired resist-

---

[2] The terms condenser and capacitor will be considered synonymous for purposes of this opinion.

ance value. In the vitreous enamel resistor, a small high-resistance wire such as a nickel chrome alloy wire was space wound on a ceramic core, with each turn of the wire separated so that it would not touch the next turn and cause a short circuit. The entire wound core was then dipped in a solution and fired to give it a vitreous enamel coating which prevented the wire from shifting and protected the unit from moisture. The factors relating to resistors that were commercially important were the comparative size and cost in relation to power-rating wattage and resistance value and the ability to stand a heating and cooling cycle without significant change in resistance value.

Filters are combinations of components (including condensers and resistors). The filter selects out of an aggregate of currents only the desired frequency, and thus eliminates from the apparatus undesirable frequencies of "static."

The use of filters has increased with the development of electronic devices. Many electrical devices, such as electric razors, motors, and automobile ignition systems, act as transmitters of energy in the radio spectrum, causing "static." This causes interference with other devices such as radio, television, radar, and other sensitive electronic equipment. Filters are attached to the annoying device for the purpose of bypassing the electric circuit for undesirable frequencies and preventing the broadcasting of the unwanted transmission. The important commercial characteristics of filters are that they perform the specific function for which they are designed and that they be relatively small in size and low in cost.

Petitioner, engaged during the years here in issue in the primary business of manufacturing and selling condensers, resistors, and filters for electrical apparatus, was originally formed to manufacture and market a radio tone control device invented by its founder, Robert C. Sprague, who is now chairman of the board and treasurer of the petitioner. This unit was not commercially successful, and shortly thereafter the petitioner began the manufacture of the Midget condenser, which was a redesigned form of the wax impregnated condenser that had formed a part of the unsuccessful tone control device. The midget condenser was constructed in many sizes ranging from 0.00025 to 0.25 microfarads and tested at 1,500 volts. It was smaller and less expensive than any bypass condensers then available, which were generally of a mica type or bulky and expensive paper condensers.

In 1929 the petitioner established a research department headed by Preston Robinson, and as a result of the work of its research laboratory the petitioner was able to market a wet electrolytic condenser by 1931, a dry electrolytic condenser in 1932, and a two-paper aluminum wax tubular condenser in 1932. The difference between a wet and a dry electrolytic condenser is the substitution in the latter type of a

wet electrolyte (a solution of boric acid or ammonium borate) with a paste electrolyte. The condensers were somewhat smaller in size and cheaper than those then used in the industry. As a result, petitioner's competitive position was enhanced and these condensers were profitable. Although some of these are still sold, their unique characteristics were matched by competitors sometime prior to World War II.

During the years 1932 through 1940 the petitioner filed a total of 40 patent applications in the electrolytic condenser field, and during the same period the petitioner filed a total of 72 patent applications covering all its fields of work. Petitioner conducted many experiments in 1936 through 1939 in the electrolytic condenser field.

Petitioner's total net sales of electrolytic condensers for the years 1937 through 1945 were as follows:

| | | | |
|---|---|---|---|
| 1937 | $1,390,002.14 | 1942 | $1,151,199.55 |
| 1938 | 790,283.32 | 1943 | 1,431,120.11 |
| 1939 | 961,664.11 | 1944 [1] | 1,809,622.46 |
| 1940 | 919,438.06 | 1945 | 1,880,235.75 |
| 1941 | 1,597,646.88 | | |

[1] Does not reflect adjustment for renegotiation refund.

In 1929 the petitioner moved from Quincy to a larger plant in North Adams, Massachusetts, and the new plant was opened in January 1930. The heavy expense of relocation was financed with borrowed funds. By the end of 1931 the petitioner was in financial difficulties, and on December 7, 1931, petitioner and its creditors executed a creditors' agreement which provided, in part, that the creditors were to appoint the treasurer for the petitioner, that a committee of four should be appointed to "exercise entire supervision over the affairs of the Debtor," and that the petitioner should undertake no new lines of manufacture or production in addition to its condenser business without the consent of the committee. These creditors were paid off in full by the petitioner by October 1937, and the creditors' agreement was terminated as of that date.

· Petitioner's net sales and net income before provision for Federal income taxes for the years 1932 through 1938 were as follows:

| Year | Net sales | Net income | Year | Net sales | Net income |
|---|---|---|---|---|---|
| 1932 | $671,266.27 | ($94,574.00) | 1936 | $2,903,492.48 | $317,747.83 |
| 1933 | 1,156,736.17 | 11,268.80 | 1937 | 2,657,785.07 | 196,999.81 |
| 1934 | 1,475,803.27 | 118,684.56 | 1938 | 1,864,941.16 | 55,708.30 |
| 1935 | 2,058,660.20 | 282,773.66 | | | |

From about 1932 to 1936 the petitioner assigned Robinson, with a reduced research staff, to work with the manufacturing division on ways to reduce costs and improve the products manufactured by the petitioner. In 1936 the petitioner obtained permission from its treasurer, who had been appointed by the creditors' committee, to release Robinson and his research group from their production re-

sponsibilities. Robinson, with additions to his staff, was then free to work on new products. Notebooks were issued to the research staff and the results of research and experimentation were recorded there.

Starting in 1936 the petitioner's research group worked on oil impregnants for condensers, which included mineral oil, castor oil, and an oil called Vitamin Q; filters; energy storage condensers used in networks; resistors; Selkar condensers; and transmitting mica condensers.

In the small paper tubular condensers manufactured by the petitioner prior to 1936, two or more layers of paper were wound in a tubular form with interleaved layers of aluminum foil, and the whole unit was impregnated with wax or cable oil. The aluminum foil served as the electrode while the paper and the impregnant served as the dielectric. In the paper spacing between the electrodes, impurities are fatal to a condenser and consequently the wound unit must be placed under vacuum to remove the air and the impregnant is then forced into the tube under pressure to remove the impurities and fix the characteristics of the condenser. The wax used in the early tubular condensers as a dielectric impregnant was paraffin wax, which had a dielectric constant of 2, the unit being measured against air which has a dielectric constant of 1. Later, a substance with the trade name of Halowax, with a dielectric constant of 4, was used in wax impregnated small tubular condensers. These wax impregnants were limited to low voltages and low temperatures, and where higher temperatures and voltages were required, the impregnant used was cable oil.

In the early 1930's the General Electric Company developed a new impregnant identified chemically as chlorinated diphenyl and sold under the trade name of Pyranol. This preempted the field in markets requiring high temperatures and voltages, such as fluorescent lights, motor applications, and industrial oil condensers. Since it had a dielectric constant over 4 it could produce the same capacity as cable oil in about one-half the size. It opened a wide field in larger condensers, commonly called industrial oil condensers, which the petitioner had not manufactured prior to that time.

In 1933 the petitioner sought to obtain a license from the General Electric Company to use Pyranol, but certain price controls required by General Electric Company were unsatisfactory to petitioner and no license agreement was executed. Three years later the General Electric Company removed the objectionable features from its licenses, and the petitioner again attempted to get a license but was informed that no new licenses were being issued.

Petitioner's research group, which was then assigned the problem of developing impregnants which would enable petitioner to compete with Pyranol, was unable to accomplish this result with a single im-

pregnant but eventually developed three separate impregnants which covered the field preempted by Pyranol. These were a mineral oil impregnant, a castor oil impregnant, and an impregnant with the trade name of Vitamin Q.

Petitioner concentrated on a search for a mineral oil impregnant which would give a long life without lowering the leakage resistance (resistance to leakage of electrical characteristics). Mineral oil had been used in condensers by petitioner and others prior to 1936. Petitioner had used a mineral oil (cable oil with resin) as early as 1930 or 1931. The leakage resistance of these cable oil impregnated condensers was poor at high temperatures, and in 1936 the petitioner established that this was due to the resin content.

By July 1937 the petitioner found two mineral oils without resin that would give a satisfactory performance at high temperatures and also had satisfactory lasting qualities. These mineral oils, which were supplied to petitioner by outside sources, were further developed and they were put into production in 1939 in a filter condenser. In 1939 the petitioner found another mineral oil, purchased from the Sun Oil Company and called Sun Triple X, which upon being further refined by the petitioner proved superior as an impregnant to the two oils found in 1937.

Petitioner continued to use cable-oil resin in its condensers for direct current until a new dry process was developed by petitioner that made it possible to use the new mineral oil impregnants on direct current condensers. By 1942 the new mineral oil had supplanted cable oil and petitioner discontinued the use of cable-oil resin as an impregnant.

Petitioner's work during the period from 1936 through 1939 on mineral oil condensers involved basic chemical research as well as work on new manufacturing processes, and resulted in the following developments: (1) High voltage designs; (2) correlation of mineral oil chemical structure to electrical characteristics; (3) drying procedures for paper; (4) impregnation techniques; (5) leak-proof terminal structures; (6) testing procedures; and (7) development of testing apparatus.

In September 1942 the petitioner investigated the effect of mineral oil on the power factor of paper condensers. During 1943 the petitioner experimented with the use of a dielectric consisting of a single layer of Hastings paper in its mineral oil condensers, and in November of that year supplied samples of mineral oil condensers so constructed to the Army Signal Corps.

Petitioner's mineral oil impregnated condensers enabled it to compete with Pyranol and to enter new fields in high temperature, high pulse, and high voltage designs essential in larger industrial oil condensers, such as automobile ignition condensers, radio condensers, high pulse condensers used in welding machines, and networks.

During World War II the Army Signal Corps obtained mineral oil condensers from at least eight other suppliers in addition to the petitioner.

Petitioner's research group, starting in 1936, also worked on a modified castor oil impregnant for condensers. Castor oil had been used by the industry in prior years in condensers, but such castor oil could not compete with Pyranol in the larger commercial applications. The castor oil was obtained by petitioner from suppliers with many of its impurities removed. Petitioner checked the acid number of the oil, removed products of hydrolysis, removed volatiles, and selectively absorbed any polar materials that were present. The factors emphasized in this work were (1) a high dielectric constant, (2) a high leakage resistance, and (3) a low power factor, a term which measures the portion of energy which when applied to the condenser turns into heat. By April 1939 design specifications were prepared for the manufacture of castor oil condensers, and they went into production in that year. The design specifications covered a.c. condensers with rated voltage ranges from 120 volts to 600 volts, withstanding flash voltages of 500 volts to 3,000 volts, and d.c. rated voltages from 200 volts to 3,000 volts with a flash voltage test as high as 6,000 volts.

Petitioner's castor oil impregnated condenser enabled it to enter the fluorescent lamp field as well as the energy storage condenser field, and it also permitted petitioner to compete with Pyranol in some areas.

In December 1946 the petitioner filed a patent application covering a process of producing rigidly encased electrical condensers and in October 1950 obtained patent No. 2,526,688 covering this process. Oil impregnants specified under the patent were mineral oil, castor oil, and a compound known as N-vinyl carbazole.

Sometime in 1944 the petitioner, after transferring the manufacture of castor oil condensers to a new plant, was forced to discontinue the manufacture of such condensers because of operational difficulties encountered there.

During World War II the Army Signal Corps obtained castor oil condensers from at least six other suppliers in addition to the petitioner.

Petitioner's research group also worked on a third oil impregnant for condensers which was finally called Vitamin Q. The search for this impregnant was concentrated in the synthetic chemical field, particularly with polymers. In 1938 and 1939 the petitioner experimented with samples of polymers obtained from outside sources. In July 1940 petitioner obtained from the Standard Oil Development Company two ranges of molecular weights of polyisobutylene which were tested by the petitioner's standard processing steps and found to be usable. In March 1941 the petitioner prepared samples of con-

densers made with the new impregnant and sent them to the Delco Radio Division of the General Motors Corporation for their evaluation. The Delco Radio Division indicated an interest in these condensers for application to auto radios.

Early in 1942 the petitioner supplied samples of the Vitamin Q condenser to the Stromberg-Carlson Company which was attempting to develop an airborne radar. These samples proved satisfactory and in June 1942 the first production specifications for the Vitamin Q condenser were issued, to be used in airborne transmitters manufactured by the Stromberg-Carlson Company. By May 1944 the petitioner had developed a Vitamin Q condenser effective for use in photoflash equipment used in airplanes, due to the light weight of the condenser in addition to its other attributes. In 1942 or 1943 the Vitamin Q condenser was also used in the firing mechanism of the atomic bomb developed by this country during the war. In 1944 or 1945 the petitioner developed a new winding machine and a new dielectric spacer for its Vitamin Q condensers used in aerial flash photography.

On February 18, 1944, the petitioner filed a patent application for an improved electrical conductor insulated with improved dielectric compositions containing monomers and/or polymers. Patent No. 2,473,985 was issued on July 21, 1949, for this improvement.

The outstanding characteristics of the Vitamin Q condenser are (1) high dielectric strength; (2) high operation temperature range; (3) long life; (4) low temperature coefficient of capacity; and (5) high insulation resistance.

The commercial applications of the oil impregnated condensers are extensive. Oil impregnated paper tubular condensers are used in the following commercial products: (1) Radio-television; (2) communications equipment; (3) audio equipment; (4) arc suppression on small motors; (5) radio interference control (noise suppression); (6) protection of relays in computers, telephone switching systems, etc.; (7) fractional horsepower motors; (8) auto, aircraft, and boat ignition; (9) power supplies for light electronic equipment; (10) business machines, including computers; (11) hearing aids; (12) electric organs; (13) vending machines; (14) radiosonde; (15) communication equipment such as radio-telephone, mobile-radio, television camera and walkie-talkie. Industrial oil condensers are used in the following commercial products: (1) Industrial power supply filters; (2) fractional horsepower motors; (3) power factor correction for increasing the load carrying capacity and voltage regulation of existing wiring; (4) power factor correction of individual motors; (5) fluorescent lamps; (6) motor controls; (7) motor braking; (8) radar; (9) communication equipment; (10) ignition for automobile, aircraft, and boats; (11) high-speed photographic equipment; (12) business

machines including computers; (13) radio noise suppression (household equipment, business machines, industrial equipment); (14) farm equipment such as electric fences, farm lighting plants, pumps, and hand tools; (15) air traffic control equipment such as airport runway lighting, and instrument landing devices; (16) control equipment for elevators, traction equipment, welders, and timers; (17) transmitting equipment, microwave relay, carrier current, wirephoto, telegraph, telautograph, facsimile, teletype, and stock tickers; (18) public address and interoffice equipment; (19) household equipment such as oil burners, refrigerators, ironers, air conditioners, and washing machines; (20) advertising (neon signs, fluorescent lighting, and high intensity gas discharge lamps); (21) medical equipment (X-ray, diathermy, electron microscope, electrocardiograph, and high energy particle accelerators); (22) in radio and television equipment, including transmitting equipment; (23) in aircraft, police, marine, radiotelephone, broadcasting, and amateur radio equipment; and (24) fathometers.

All of the commercial fields listed above, with the exception of radar and television, were available before World War II.

Petitioner's sales of condensers using the newly developed oil impregnants were as follows:

| Year | Oil-impregnated small paper tubular condensers | Industrial oil condensers | Year | Oil-impregnated small paper tubular condensers | Industrial oil condensers |
|---|---|---|---|---|---|
| 1939 | $225,156.03 | $20,000.00 | 1943 | $2,309,286.21 | $2,174,636.22 |
| 1940 | 314,620.53 | 62,568.26 | 1944 [1] | 2,875,821.69 | 2,599,304.88 |
| 1941 | 805,547.38 | 624,372.22 | 1945 | 1,246,270.21 | 1,690,550.46 |
| 1942 | 1,258,247.95 | 788,579.75 | | | |

[1] Does not reflect adjustment for renegotiation refund.

Petitioner's sales of such condensers, by oil impregnant, were as follows:

| Year | Mineral oil | Castor oil | Vitamin Q |
|---|---|---|---|
| 1937 | 0 | 0 | 0 |
| 1938 | 0 | 0 | 0 |
| 1939 | $225,156.03 | $20,000.00 | 0 |
| 1940 | 345,904.66 | 31,284.13 | 0 |
| 1941 | 1,117,733.49 | 312,186.11 | 0 |
| 1942 | 1,577,537.83 | 319,289.88 | $155,000.00 |
| 1943 | 3,034,164.95 | 724,878.74 | 734,878.74 |
| 1944 [1] | 3,742,256.65 | 866,434.96 | 867,434.96 |
| 1945 | 2,091,545.44 | 0 | 855,275.23 |

[1] Does not reflect adjustment for renegotiation refund.

Petitioner's time and cost devoted to its work on the new oil-impregnated small paper tubular condensers and industrial oil condensers in the years 1936 through 1939 were as follows:

| Year | Hours spent in experiments | Direct labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 900 | $838.60 | $125.45 | $964.05 |
| 1937 | 1,155 | 1,250.85 | 901.86 | 2,152.71 |
| 1938 | 1,585 | 1,459.00 | 957.54 | 2,416.54 |
| 1939 | 2,232 | 2,086.24 | 1,246.11 | 3,332.35 |

In December 1940 the petitioner submitted samples of condensers (Type CA–355) to the Signal Corps. Upon being tested they were found unacceptable for Signal Corps equipment. As late as August 1945 the petitioner submitted samples of types of condensers to the Signal Corps which failed the specification tests.

Petitioner's research on resistors started in about 1936 in the field of wire-wound resistors which at that time consisted of single strands of wire wound on a core so that each round was separated from the next round and then baked in a ceramic coating to hold the wires in place to prevent short circuits. In 1936 the petitioner discovered methods for a bank-wound resistor, and in 1937 developed a number of processes for depositing materials directly on the resistor wire. From 1937 through 1939 the resistor research covered the cataphoretic and electrophoretic deposition of many materials on various metals, and methods were established for depositing many insulators on metal electrodes of any shape. Particular attention was devoted to depositing suitable insulators on copper and iron alloy and nickel alloy wires.

On October 1, 1937, the petitioner obtained a license from Samuel Ruben, an inventor who had obtained patents on electrical resistors and heater elements and who was about to file patent applications covering electrical resistors and heater elements in which the resistance wire was coated with an electro-deposited refractory insulation. The license provided for a royalty of 5 percent on each resistor manufactured, sold, or used by petitioner, with a reduction to 3 percent after the royalties in any year had reached $5,000. The duration of the license was for 15 years. In July 1943 the petitioner and Ruben terminated this license agreement and in its place Ruben granted to petitioner an exclusive license, with the right to grant sublicenses thereunder, all inventions, patent applications, and patents pertaining to (a) processes for applying insulation of ceramic materials to wire; (b) insulated wires produced by said processes; and (c) the employment of such insulated wires in the electrical and related fields. The royalty was reduced to 3 percent of the net selling price of all resistors and heater elements employing the designated elements.

In October 1937 the petitioner entered into an agreement with its sales agency, Sprague Products Company, whereby the two corporations would employ Leon Podolsky, an engineer who had been in the resistor business, to work on the new Ruben resistor. Podolsky was

to devote at least one-half of his time to research and development for the petitioner and petitioner was to pay one-half of his salary, and the other half of his time was to be devoted to selling the product. Prior to 1946 the petitioner and Sprague Products Company had no interlocking directorate or duplication of corporate officers, and the two were completely separate corporations as far as stockholding was concerned.

Samuel Ruben's idea included the electrophoretic deposition of a ceramic on wire, the winding of the wire into a coiled form and the sealing of the wire coil in a block of molten metal. It was not commercially useful, since the ceramic insulation was not flexible and it did not provide a perfect insulation for the wire, which caused short circuits when the molten metal was applied. Petitioner continued its research and it developed a two step process for depositing ceramic material on nichrome wire. A ceramic was first deposited by electrophoretic deposition, and then a coating of formvar (a resinous material developed by an outside corporation) was applied which increased the flexibility and the resistance to abrasion of the coating on the wire. Such coated wire could be wound singly or in banks.

In 1939 petitioner manufactured and placed on the market its first resistor, with the registered trade name of "Koolohm resistor." The center of the Koolohm resistor was a flexible ceramic-coated nichrome wire which petitioner later registered under the trade name Ceron. The ceramic coating developed by the petitioner permitted multilayer winding of the wire up to 14 layers. The thinness of the coating allowed the use of wires with a greater diameter in a given space, and because the entire winding process eliminated the necessity of spacing the wires, smaller resistors were possible.

The Koolohm resistors sold by the petitioner to the Signal Corps early in World War II were in some instances defective. The cement used in the end seal of the resistors reacted with the wire lead when exposed to moisture, causing corrosion of the wire lead. In 1943 the petitioner corrected this defect by substituting a melamine cement (a proprietary compound of the American Cyanamid Corporation) for the old cement in the end seal. In December 1943 the petitioner filed a patent application for a molded melamine end seal for resistors and condensers. Patent No. 2,444,880 was issued on July 6, 1948, for this invention.

Another product resulting from the petitioner's resistor program was the grade 1, class I resistor, which is the United States Navy Department designation of a resistor that could withstand immersion in freezing salt water after being operated at temperatures of 275 degrees centigrade. In 1939 the petitioner sought to meet these specifications by enclosing the Koolohm resistor in a glass tube sealed with metal caps at the ends. The difficulty lay in finding a hermetic

seal between the metal end cap and the glass which could stand a wide range in temperatures without fracturing the joint, due to the differences in expansion coefficient between the glass and the metal cap.

In 1940 the petitioner developed several unsuccessful designs for the glass and metal casings. In 1941 the petitioner found a workable design for this glass enclosed resistor, using for this purpose a tempered glass tube obtained from the Corning Glass Works. Prior to sealing with the metal end caps, the ends of the glass tube were metalized. Petitioner experimented with a lead spray for this purpose but it was unsatisfactory, and the petitioner found it was able to obtain glass tubes already metalized from the Corning Glass Works. The metalizing of the ends of the glass tubes was done by the Corning Glass Works with processes of its own, with materials developed in its own laboratories. Petitioner then applied the metal end caps to Corning's metalized tube and sealed the two parts together with a soft metal alloy which allowed for the difference in expansion.

On May 29, 1941, the petitioner notified the Navy Department that it had completed a resistor design to meet the Navy's specifications for a grade 1, class I resistor. On October 23, 1941, the Navy Department notified petitioner that its sample resistors failed to meet specifications in the following respects: In their ability to withstand exposure to a temperature of 275 degrees centigrade and high humidity; wire coverage of winding tube; and dimensions. On January 26, 1942, the Navy Department notified petitioner that its sample resistors satisfactorily met the Navy's requirements for grade 1, class I resistors.

On June 20, 1941, the petitioner notified the Navy Department that it had completed a resistor design that met the Navy's specifications for multiplier resistors, and on July 28, 1941, the Navy Department notified the petitioner that its samples satisfactorily met all the Navy requirements.

Petitioner obtained several patents as a result of its research and development of resistors. Patent No. 2,386,634 was filed on March 20, 1940, and granted on October 9, 1945. Its six claims cover a "highly flexible, insulated, electrical conductor" processed by a method of electrophoretically depositing a combination of a refractory material (such as vitreous enamel) with an elastomer (such as resin). Patent No. 2,332,255 was filed on March 10, 1942, and granted on October 19, 1943. Its nine claims covered all elements of the hermetically sealed resistors, including its construction, the method of sealing the caps to the casing, and the idea of filling the casing with a pressurized gaseous filling to prevent changes of pressure upon heating.

Patent No. 2,386,628 was filed on June 3, 1942, and granted on October 9, 1945. This patent covered a glass-to-metal seal, and its three

claims covered the use of soft metals and metal alloys to accomplish the seal so "that it adjusts itself * * * to the differential expansion" between the borosilicate glass and the metal ends. Patent No. 2,421,652 was filed on August 2, 1943, and granted on June 3, 1947. Its eight claims covered broadly any "highly flexible, abrasion-resistant, electrically insulated conductor * * * to which is * * * attached * * * [any] sintered refractory dielectric material * * * [and] impregnated with a synthetic resinous material."

Patent No. 2,495,630 was filed on May 20, 1944, and granted on January 24, 1950. This patent covered an electrophoretically deposited porous refractory coating for several types of wire, impregnated by an aqueous solution of nitrate. It was the object of this invention to increase the flexibility and abrasion resistance of the coated wire. On May 5, 1944, the petitioner filed a patent application for an electrical seal to be used as an improved hermetic glass-to-metal seal. A patent (No. 2,449,759) was granted on September 21, 1948. A patent application was filed by the petitioner in September 1946 for a process for an electrophoretically deposited ceramic coating on wire, and a patent (No. 2,478,322) was granted on August 9, 1949.

The Koolohm resistor, the meter multiplier, and the grade 1, class I resistors all used the basic resistance unit of flexible, insulated nichrome wire wound on a ceramic core. The outer casings were different. The Koolohm resistor was protected with a thin flexible ceramic tube, sealed at the ends with resin or cement; the meter multiplier employed the same core and winding but was assembled in a glass tube with soldered metal ferrules at the ends; the grade 1, class I resistor employed the same inner unit assembled in a glass tube with a metal end seal which would withstand extreme thermal changes.

The meter multiplier, as first manufactured, used large quantities of nichrome wire. To eliminate the need for wire, Leon Podolsky developed a horseshoe-shaped segment of carbon resistor that could be assembled by combining it with the patented glass tube, metal end, and seal assembly that had been used in the grade 1, class I resistors. Podolsky's final assembly was made in July 1942 and it was called the Meg-O-Max resistor. In November 1942 the petitioner shipped two sample Meg-O-Max resistors to the United States Navy (Bureau of Ships) with the advice that ratings on such resistors were tentative due to the recent nature of the development. Two patent applications covering the construction of such resistors were filed on February 19, 1943, and patents (Nos. 2,347,795 and 2,347,796) were granted on May 2, 1944. Both patents were assigned by Podolsky to Sprague Products Company.

Among the commercial products in which resistors were used in

1936 through 1939 were (1) industrial controls; (2) air-conditioning controls; (3) power supplies; (4) radio-television; (5) amplifiers; (6) washing machines; and (7) food mixers.

Petitioner's net sales of resistors during the years 1938 through 1945 were as follows:

| Year | Category R resistors | Category G resistors | Not identified | Meg-O-Max | Total |
|---|---|---|---|---|---|
| 1938 | | | $119.87 | | $119.87 |
| 1939 | | | 2,502.30 | | 2,502.30 |
| 1940 | $4,860.86 | | 1,665.11 | | 6,525.97 |
| 1941 | 32,112.76 | $2,997.96 | (5,542.87) | | 29,567.85 |
| 1942 | 326,730.97 | 30,086.24 | (21,390.22) | | 335,426.99 |
| 1943 | 1,764,667.13 | 305,800.30 | .13 | $87,960.08 | 2,158,427.64 |
| 1944 [1] | 3,127,195.40 | 758,710.29 | 200.84 | 662,710.64 | 4,548,817.17 |
| 1945 | 1,286,875.75 | 590,183.27 | 21.85 | 626,103.88 | 2,503,184.75 |

[1] Does not reflect adjustment for renegotiation refund.

Category R resistors are those resistors with a ceramic insulating coating on which royalties were payable to Samuel Ruben. Resistors listed under category G are resistors with a glass insulating coating on which no royalties were paid. This coating was the coating on the wire and had no relationship to the glass-to-metal seal-container. Both categories R and G would include resistors which were manufactured with the glass-to-metal seal-container but not necessarily all of them.

Petitioner's time and cost devoted to its work on resistors in the years 1936 through 1939 were as follows:

| Year | Hours spent in experiments | Labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 6 | $13.80 | $2.06 | $15.86 |
| 1937 | 584 | 551.20 | 397.42 | 948.62 |
| 1938 | 939 | 2,196.16 | 1,441.34 | 3,637.50 |
| 1939 | 746 | 1,737.34 | 1,037.71 | 2,775.05 |

In 1936 the petitioner started a program to develop filters. About 300 pieces of equipment that transmitted interfering noises were studied, and it was decided by the petitioner that it was not possible to design a small number of finished filters to apply to a wide range of interfering equipment. Instead, the petitioner developed 15 basic components, which consisted of condensers and choke coils, and by a proper selection of 2 or more of these basic components it was possible to eliminate objectionable interference from about 95 percent of the 300 pieces of equipment which were being tested. Petitioner also designed an interference analyzer which indicated the proper combination of components to eliminate interference in a piece of equipment. The interference analyzer contained the 15 basic components in a housing, and these components were interconnected in various ways by a system of dials. The interference analyzer, the

locator and the 15 basic components were sold through the Sprague Products Company in a package beginning in 1939. The interference analyzer was manufactured by another manufacturer according to the petitioner's combined specifications. The petitioner's first specification for the manufacture of a composite filter was on July 26, 1939. Petitioner's basic work on filter components led it into the design of complete filter assemblies for particular applications.

In 1940 the petitioner analyzed the sources of interference on military trucks for the Signal Corps Laboratories. During World War II there occurred a greater utilization of high frequencies by military equipment, and for this higher frequency application, filters required less capacitance, less inductance, and smaller condensers. In 1943 the petitioner did some engineering and development work on filters for high frequency applications, and in that year the petitioner was manufacturing noise suppression filters for several branches of the military service. Petitioner had a line of general purpose filters, but in most cases the special nature of the problem, including considerations of space, temperature, and vibration, made it necessary to engineer each filter manufactured to meet the specific requirements.

On July 21, 1943, the petitioner filed a patent application for a Hypass condenser, and a patent (No. 2,440,652) was granted on April 27, 1948. This condenser replaced the filter in airborne applications, where existing filters were not satisfactory, sometime in 1944 or 1945.

In 1944 the petitioner obtained a research and development type contract from the Signal Corps for the development of radio interference type filters.

Commercial products in which filters were used in 1936 through 1939 included diathermy equipment, communication equipment in police cars and fire engines, fluorescent lights, movie projectors, and industrial heating.

Petitioner's time and cost devoted to its filter program in the years 1936 through 1939 were as follows:

| Year | Hours spent in experiments | Direct labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 472 | $986.18 | $147.53 | $1,133.71 |
| 1937 | 400 | 980.00 | 706.58 | 1,686.58 |
| 1938 | 701 | 1,602.25 | 1,051.56 | 2,653.81 |
| 1939 | 516 | 1,321.56 | 789.37 | 2,110.93 |

Petitioner's net sales of completely assembled filter units in the years 1939 through 1945 were as follows:

| | | | |
|---|---|---|---|
| 1939 | $6,156.90 | 1943 | $1,120,106.58 |
| 1940 | 10,451.73 | 1944 [1] | 967,701.05 |
| 1941 | 21,095.20 | 1945 | 769,071.88 |
| 1942 | 800,573.60 | | |

[1] Does not reflect adjustment for renegotiation refund.

In 1936 the petitioner began a program of developing mica condensers, which had been manufactured for many years by other firms under processes and methods some of which were not in the public domain. Mica, a mineral which comes in odd sizes, thicknesses, and grades, is a good dielectric material in condenser applications requiring high voltages, high temperatures, and precision in the condenser. It was necessary for the petitioner to determine the grades and thicknesses of mica required for many voltages and frequencies and to discover the loss requirements, and it was also necessary to develop processes for splitting the laminated mica into very thin sheets of required dimensions. Petitioner determined that a serious shortcoming of existing mica condensers was the air or gas trapped between the layers of mica and tinfoil. To eliminate this, the petitioner developed a method of depositing silver chemically bonded to the mica. This method proved unsatisfactory, and the petitioner developed two other processes for silvering, one a firing process, and the other a process for spraying the silver powder on the mica in the form of a lacquer. Petitioner then proceeded to the problems of molding silvered mica films into condensers and measuring the characteristics of the mica condensers. By 1938 the petitioner obtained desired results in the silvering process, but a defect remained, relating to the temperature coefficient of capacity, and it was found to be due to a shifting of the mica sheets in respect to each other. The defect was eliminated by a polymerizing varnish consisting of a resin and solvent which was impregnated into the varnish, dried, and then polymerized with heat which converted the films into a solid structure.

On April 18, 1939, the petitioner prepared internal manufacturing specifications and testing specifications covering all manufacturing processes for the new mica condenser. When the new condenser was put in production in 1939, changes were made in the earlier specifications as a result of production experience.

In September 1939 the petitioner was compelled to make changes in its mica condenser that would reduce its cost to a competitive level. A modified, thinner silvering process was then developed to reduce costs. Late in 1939 the petitioner went into the general production and sale of transmitting mica condensers.

On March 3, 1941, the petitioner's board of directors authorized an appropriation of $50,000 to cover expenses already incurred in the development of transmitting mica condensers and for additional expenses for tools, equipment, and inventory for such work.

During 1943 the petitioner developed a new type of mica condenser. On October 19, 1944, the petitioner filed a patent application for a clamp to be used in clamping stacked mica condensers prior to the application of impregnants.

Commercial products in which transmitting mica condensers were used in the period 1936 through 1939 were: (1) Commercial broadcasting equipment; (2) industrial welding; (3) radio transmitters; (4) milk pasteurization equipment; (5) X-ray machines; (6) vacuum tube bombarders; (7) shortwave equipment; and (8) communication services.

Petitioner's time and cost devoted to its mica condenser program in 1936 through 1939 were as follows:

| Year | Hours spent in experiments | Direct labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 705 | $670.50 | $100.31 | $770.81 |
| 1937 | 1,464 | 1,299.80 | 937.16 | 2,236.96 |
| 1938 | 1,310 | 1,123.40 | 737.29 | 1,860.69 |
| 1939 | 2,177 | 1,784.52 | 1,065.89 | 2,850.41 |

Petitioner's net sales of transmitting mica condensers in the years 1939 through 1945 were as follows:

| | | | |
|---|---|---|---|
| 1939 | $46,426.39 | 1943 | $1,537,885.70 |
| 1940 | 7,673.87 | 1944 [1] | 890,937.72 |
| 1941 | 128,097.53 | 1945 | 263,430.14 |
| 1942 | 714,712.23 | | |

[1] Does not reflect adjustment for renegotiation refund.

In 1936 the petitioner began work on the development of energy storage condensers, which subsequently became a component of its radar networks. Networks is a term synonymous with artificial transmission lines, delay networks, and pulse-forming networks. The purpose of a pulse-forming network is to shape the pulse from a radar transmitter which is reflected off the objects that are intercepted in its path and reflected back to the receiving equipment. The important characteristics of energy storage condensers are: (1) Stability on direct current and on alternating current in wide ranges and high leakage resistance; (2) a low power factor; and (3) the ability to withstand corona, which is a generic term for a type of electric discharge that takes place in gases. Petitioner's research program on energy storage condensers was started with the purpose of developing a substitute for the wax impregnated condensers then used in automobile ignition systems. A cable-oil resin mixture used as an impregnant in the condensers showed some improvement, but it was not wholly satisfactory. Low leakage resistance developed with increasing temperature, and this was finally overcome by the use of mineral oil as an impregnant. By 1939 processes were developed to control leakage resistance, stability at low and high temperatures, and voltage breakdown. These mineral oil impregnated energy storage condensers developed by the petitioner were, in 1939, adopted by the Ford Motor Company for its entire line of automobiles.

Late in 1938 the petitioner began the development of energy storage condensers to be used in the field of percussion welding. Large condensers were needed for this use, on the order of 150 to 200 microfarads with voltages as high as 3,000 volts d.c. It was determined that the petitioner's condensers could be arranged in banks and fed into a stepdown transformer to increase the current, with the result that very large surges of current effected the welding. Petitioner, in work on this problem, used both mineral and castor oil impregnated condensers, finally choosing castor oil impregnated condensers on economic grounds. Petitioner also worked on the problem of insulating the condenser sections from the container and avoiding breakdown in corona at the terminals. By the end of 1939 the petitioner had developed processes for a satisfactory energy storage condenser in this field, and it went into production early in 1940.

In 1941 the petitioner was able to supply specialized condensers to the British armed forces for use in radar equipment in high temperature areas. Petitioner was able to supply these specialized condensers 3 or 4 weeks after the first request was made.

Petitioner's pulse-forming networks used in radar sets consisted of capacitors, a large number of small choke coils, insulators, tubes, and other elements contained in a metal container with from 12 to 14 terminals.

In 1942 the Radiation Laboratory at Massachusetts Institute of Technology had assembled a pulse-forming network in laboratory form which consisted of about 90 percent terminals and casings and about 10 percent condensers and choke coils. This assembly used, as energy storage condensers, the petitioner's mineral oil impregnated tubular condensers. Petitioner was requested to assemble this rough network into a single package with a single pair of terminals, and petitioner was able to create a suitable package in about 3 weeks. For about a month or two in 1942 the petitioner supplied the components for such networks, and then the Radiation Laboratory turned over to the petitioner the assembly of the complete unit.

There is a difference between the pulse-forming networks used in radar and the networks used in ordinary industrial equipment, such as welding apparatus. A different type of investigation is needed to create the pulse-forming type.

In the original radar equipment the shape of the pulse transmitted was triangular, but it was later determined that a square pulse was more efficient.

In 1943 the petitioner was active in the design and production engineering of a line of mica condenser radar networks. The original networks manufactured by the petitioner during World War II were entirely of the mica type, but later the petitioner began to manufacture a paper condenser radar network. Both the mica and the paper con-

densers had been developed by the petitioner in the 1936–1939 period. Some experimental work was necessary in 1943 and 1944 in making the transition from the mica type networks to the paper type.

Petitioner filed a patent application in August 1945 for an impulse generating system and the networks for such system, and a patent (No. 2,535,093) was granted on December 26, 1950.

In 1945 the military services developed new uses for networks, and the petitioner engaged in circuit and mechanical design to meet these new uses. In 1944 and 1945 the petitioner made several design changes in its networks.

Petitioner's time and cost devoted to its work on the condenser components of networks in the years 1936 through 1939 were as follows:

| Year | Hours spent in experiments | Direct labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 250 | $215.50 | $32.24 | $247.74 |
| 1937 | 260 | 247.20 | 178.23 | 425.43 |
| 1938 | 140 | 121.00 | 79.41 | 200.41 |
| 1939 | 350 | 422.60 | 252.42 | 675.02 |

Petitioner's net sales of networks from 1942 through 1945 were as follows:

| | | | |
|---|---|---|---|
| 1942 | $50,084.90 | 1944 [1] | $2,791,511.59 |
| 1943 | 810,765.64 | 1945 | 690,888.21 |

[1] Does not reflect adjustment for renegotiation refund.

In 1932 or 1933 the petitioner obtained cellophane from which the plasticizer (a liquid chemical which made the cellophane pliable) had been washed and experimented with it as a dielectric in electrolytic condensers. In 1936 the petitioner prepared some single layer and double layer cellophane condensers and impregnated them. The thickness of cellophane available at that time made its use impractical even though the results were satisfactory. From 1936 through 1939 the petitioner tested a number of dielectric films, including cellulose acetate, polystyrene, and chlorinated polyvinyl-chloride, but none of them were thin enough. In 1937 the petitioner worked together with Samuel Ruben on an electrodialysis process of producing a purified form cellophane. The cellophane so produced was used together with an impregnating material developed by Ruben in order to make condensers that would compete with the Pyranol-paper combination used by competitors. Again the result, while effective, did not prove economically sound.

In 1937 and 1938 the petitioner worked on impregnants that could be used with cellophane and similar films. An attempt was made to

use a liquid monomer as an impregnating material and to solidify the structure by polymerization, which would create a rigid condenser that would withstand pressure and be resistant to moisture. A monomer is a compound that may be liquefied for use as an impregnant and then solidifies upon polymerization. Styrene, a monomer, was used, and when polymerized in place produced a rigid condenser, but the material deteriorated with time.

Sometime in 1938 or 1939 the petitioner learned of a patent of I. G. Farben Industry for N-vinyl carbazole but was unable to obtain any of the material, which from its description appeared to have good dielectric properties. The synthesis of this material called for the dissolving of carbazole in acetone and running in acetylene under pressure in the presence of a suitable catalyst. About the middle of 1941 the petitioner prepared a laboratory to synthesize the N-vinyl carbazole, and on December 18, 1941, the crucial piece of equipment necessary for the synthesis under the I. G. Farben Industry processes was received from the American Instrument Company. By the end of 1942 the equipment was ready and the petitioner was able to carry out successfully the synthesis of N-vinyl carbazole according to the I. G. Farben directive. The directions were explicit and when followed produced N-vinyl carbazole exactly as specified.

In 1942 or 1943 the petitioner applied N-vinyl carbazole to a mica substitute condenser, a molded condenser developed by the Bell Telephone Laboratory and Western Electric Company. Petitioner's application of the polymer solved problems which had been encountered in the development of the molded condenser. This resulted in a new condenser, using paper as a dielectric, called the Prokar condenser. In June 1944 the Prokar condenser was still in the development stage.

During this same time the petitioner worked on a new annular condenser which was given the name Selkar. A single cellophane dielectric, previously developed, was split to the desired thinness and impregnated and polymerized with N-vinyl carbazole, producing a very small condenser with a very rigid mechanical structure with considerable resistance to moisture. Samples of this new annular condenser were prepared in March 1943 and submitted to the laboratories at Johns Hopkins University.

Petitioner developed both an annular and tubular Selkar condenser, the annular type having a much larger capacity than the tubular type. The annular Selkar condenser was the first to be developed by the petitioner. The tubular type was developed late in 1944. The annular Selkar condenser used cellophane as the dielectric, the tubular Selkar condenser used cellulose acetate, and the Prokar condenser used paper.

Petitioner's Selkar condensers of both types were used from 1944 in the proximity fuse used by the Navy in both antiaircraft and Howitzer shells. A proximity fuse is basically a miniature transmitter and receiver housed in the nose of a shell. Petitioner's Selkar condensers were an improvement over the wax-impregnated paper condensers used prior to that time and which had been obtained by the Navy from the petitioner and from other sources.

The Navy obtained condensers for its proximity fuses from at least four other suppliers. The condensers from some of these other suppliers were limited to the lower velocity Howitzer use.

Petitioner obtained the cellophane used by it in its Selkar condenser from an outside source. Petitioner, after it had received its orders from the Navy for the Selkar condenser, obtained from an outside source the N-vinyl carbazole used in such condenser.

Petitioner's net sales of Selkar condensers in 1944 and 1945 were $1,108,071.88 and $5,488,876.86, respectively. Its net sales of the Prokar condenser in 1944 and 1945 were $24,051.01 and $73,346.75, respectively. (The 1944 net sales figures do not reflect adjustment for a renegotiation refund.)

Petitioner's time and cost devoted in the years 1936 through 1939 to its work on cellophane and similar dielectrics, and to the impregnants that could be used with these dielectrics, were as follows:

| Year | Hours spent in experiments | Direct labor cost | Material cost | Total cost |
|---|---|---|---|---|
| 1936 | 50 | $78. 60 | $11. 76 | $90. 36 |
| 1937 | 143 | 211. 00 | 152. 13 | 363. 13 |
| 1938 | 430 | 482. 80 | 316. 86 | 799. 66 |
| 1939 | 80 | 143. 05 | 85. 44 | 228. 49 |

In 1943 the petitioner supplied the necessary equipment to put four subfactories into production. Under this subfactory arrangement the petitioner furnished the equipment, material, engineering, and technical guidance, while the subfactory furnished the manufacturing space, general management, and labor. This arrangement permitted the petitioner to expand its production facilities, and it shortened the training time of management personnel. It differed from a subcontracting arrangement in that subcontracting involved a transfer of responsibility to another manufacturer which supplied equipment, engineering, manufacturing processes, and related activities. In 1944 the petitioner added a fifth subfactory, and in 1945, a sixth.

Petitioner had subfactory expenses for the years 1943, 1944, and 1945 as follows:

| Firm | Operation | Expense | | |
|------|-----------|---------|---|---|
| | | 1943 | 1944 | 1945 |
| Blake Manufacturing Corp__ | Complete assembly of radio noise suppression filters. | $200,605.25 | $312,527.76 | $161,355.72 |
| Nashua Gummed & Coated Paper Co. | Wire wound Navy type Power Resistors | 31,365.84 | 519,167.25 | 234,497.71 |
| Rock of Ages Corp_____ | Not specified_____ | | | 182,109.60 |
| Rogers Lunt & Bolen Co_____ | Subassemblies for "bathtub" type capacitors. | | 107,074.73 | 107,151.73 |
| A. G. Spaulding & Bros., Inc. | Metal encased paper capacitors, paper annulars, and Selkar capacitors. | 94,943.67 | 1,179,887.02 | 2,172,898.69 |
| Vermont Marble Co_____ | Mica preparation_____ | 227,706.39 | 494,680.59 | 143,552.40 |
| Total_____ | | 554,621.15 | 2,613,337.35 | 3,001,565.85 |

Petitioner's industry is highly competitive, with over 200 manufacturers. A unique product developed by the petitioner commands a relatively higher profit until competition develops. Such competition may develop in 3 to 5 years, and in some instances considerably longer.

By 1943, 94.5 percent of the petitioner's business was connected with the war effort.

Petitioner was subject to renegotiation of its profits during the years 1942 through 1945 and was required to make a refund only for 1944, in the amount of $442,970. The 1944 amounts shown below are after renegotiation. Petitioner's net sales and net income before taxes for the years 1939 through 1945 were as follows :

| Year | Net sales | Net income | Year | Net sales | Net income |
|------|-----------|------------|------|-----------|------------|
| 1939_____ | $2,296,377.34 | $104,341.02 | 1943_____ | $14,468,539.90 | $1,489,119.50 |
| 1940_____ | 2,125,760.89 | 71,290.58 | 1944_____ | 20,357,749.67 | 2,563,795.23 |
| 1941_____ | 4,698,476.67 | 436,382.65 | 1945_____ | 16,839,253.95 | 2,605,300.99 |
| 1942_____ | 7,373,154.76 | 774,647.16 | | | |

Petitioner's largest competitors in the period 1936 through 1945 were Cornell-Dubilier and Aerovox. No two manufacturers in petitioner's industry were competitive on every item manufactured. The sales of Cornell-Dubilier and Aerovox in the years 1939 through 1945 were as follows:

| Year | Cornell-Dubilier | Aerovox | Year | Cornell-Dubilier | Aerovox |
|------|------------------|---------|------|------------------|---------|
| 1939_____ | $2,653,000 | $1,009,000 | 1943_____ | $18,242,000 | $9,153,000 |
| 1940_____ | 3,958,000 | 1,577,000 | 1944_____ | 21,505,000 | 9,680,000 |
| 1941_____ | 6,417,000 | 3,299,000 | 1945_____ | 19,852,000 | 8,583,000 |
| 1942_____ | 12,485,000 | 6,200,000 | | | |

After the petitioner had completed the research and development work that resulted in a new line of products and after such products had been placed in production, it was still necessary to furnish, design,

test, and manufacture numerous units to meet a particular manufacturer's requirements as to space, housing, terminal arrangements, and electrical characteristics. This applied to both new and old products.

It was the petitioner's policy during the years 1941 through 1945 to file patent applications on ideas or inventive concepts soon after they were conceived and usually after reduction to practice. The costs up to the time the patent application was filed were moderate. Thereafter, greater costs were incurred in research, development, engineering pilot plant operations, and small scale production. Many of the petitioner's ideas or inventive concepts never reached the research stage.

In the years 1936 through 1940 the petitioner filed 44 patent applications on its products or processes. Of this total, 17 were for nonelectrolytic condensers, 19 for electrolytic condensers, 2 for networks, 3 for resistors, and 3 miscellaneous.

In the years from 1941 through 1946 the petitioner filed 50 patent applications on its products or processes. Of this total, 22 were for nonelectrolytic condensers, 2 for electrolytic condensers, 6 for networks, 14 for resistors, 3 for glass-to-metal seal, and 3 miscellaneous.

In the years 1941 through 1946 the petitioner filed the following patent applications for which patents were subsequently obtained:

| Related category of product | Patent application serial No. | Date filed | Direct labor cost | Number of months from start of work to the filing date of patent application |
|---|---|---|---|---|
| Resistors | 496,978 | August 1943 | $2,759.20 | 10 |
| | 421,524 | December 1941 | 719.40 | 3 |
| | 515,382 | December 1943 | 985.28 | 5 |
| | 434,121 | March 1942 | 309.00 | 1 |
| | 516,328 | December 1943 | 507.40 | 1½ |
| | 536,448 | May 1944 | 1,630.60 | 7 |
| | 572,993 | January 1945 | 775.80 | 4 |
| | 697,772 | September 1946 | 845.50 | 3 |
| | 681,169 | July 1946 | 549.60 | 2 |
| Networks | 612,690 | August 1945 | 4,408.50 | 20 |
| Selkar condensers | 510,918 | November 1943 | 1,691.36 | 11 |
| | 522,884 | February 1944 | 245.98 | 14 |
| | 525,444 | March 1944 | 1,039.12 | 15 |
| | 718,962 | December 1946 | 813.39 | 48 |
| | 559,460 | October 1944 | 932.97 | 10 |
| Vitamin Q condensers | 522,884 | February 1944 | 245.98 | 14 |
| | 718,962 | December 1946 | 813.39 | 48 |
| Mineral oil condensers | 718,962 | _____do_____ | 813.39 | 48 |
| Castor oil condensers | 718,962 | _____do_____ | 216.80 | 48 |
| Transmitting mica condensers | 559,458 | October 1944 | 832.00 | 10 |

In the above table, where a patent application concerns more than one product category, the costs have been apportioned among the relevant products. A filing fee of $30 was paid when each application was filed.

In the years 1940 through 1946 the petitioner also filed the following patent applications, some of which were subsequently abandoned:

| Related category of products | Patent application serial No. | Date filed | Related category of products | Patent application serial No. | Date filed |
|---|---|---|---|---|---|
| Resistors | 325,043 | March 1940. | Vitamin Q condensers. | 324,724 | March 1940. |
| | 472,465 | January 1943. | | 480,137 | March 1943. |
| | 594,429 | May 1945. | | 489,475 | June 1943. |
| | 605,781 | July 1945. | Mineral oil condensers. | 324,724 | March 1940. |
| | 576,074 | March 1945. | | 489,475 | June 1943. |
| Networks | 561,660 | November 1944. | | 532,974 | April 1944. |
| | 475,051 | February 1943. | Castor oil condensers. | 324,724 | March 1940. |
| | 580,137 | March 1943. | | 532,974 | April 1944. |
| Selkar condensers | 489,475 | June 1943. | | | |
| | 532,974 | April 1944. | | | |
| | 689,634 | August 1946. | | | |

In the above table, where a patent application relates to more than one product category, it is listed under each of the relevant categories. A filing fee of $30 was paid when each application was filed.

Petitioner made it a practice to issue laboratory notebooks to certain of its employees to record experimental and other work. During 1943 at least 17 of these laboratory notebooks recorded work related to paper condensers, oil impregnants, filters, resistors, networks, mica condensers, and Selkar condensers, during 1944 at least 26 notebooks recorded work related to the same product categories, and during 1945 at least 6 laboratory notebooks recorded similar work.

From 1941 the petitioner maintained a standard cost department which determined the standard costs of various products on the basis of manufacturing specifications prepared by the petitioner's engineering department and on the basis of many time studies made of the labor involved in each product. Costs were not segregated on the petitioner's books by department or by product, but they were shown by the category of the expenditure. Direct labor and indirect labor were recorded as such, and material purchases were included in a single account, while other direct and indirect costs such as depreciation, repairs, insurance, heat, light and power, and taxes were recorded in general accounts.

Petitioner's costs relating to total net sales for the years 1937 through 1945 were as follows:

| Year | Actual material cost [1] | Actual direct labor cost | Actual factory overhead [2] | Total actual factory costs |
|---|---|---|---|---|
| 1937 | $973,036.04 | $589,977.28 | $469,734.65 | $2,032,747.97 |
| 1938 | 668,798.20 | 422,900.71 | 344,731.39 | 1,436,430.30 |
| 1939 | 817,360.76 | 556,552.89 | 399,647.58 | 1,773,561.23 |
| 1940 | 737,207.02 | 512,217.36 | 414,321.42 | 1,663,745.80 |
| 1941 | 1,698,338.23 | 1,062,979.79 | 914,164.02 | 3,675,482.04 |
| 1942 | 2,553,294.43 | 1,369,147.62 | 1,834,435.00 | 5,756,877.05 |
| 1943 | 4,861,842.36 | [3] 2,666,248.44 | [3] 3,425,387.31 | [3] 10,953,478.11 |
| 1944 | 7,448,133.15 | [3] 2,402,164.72 | [3] 3,377,078.40 | [3] 13,227,376.27 |
| 1945 | 4,775,412.07 | [3] 1,604,658.65 | [3] 2,964,398.53 | [3] 9,344,469.25 |

[1] Cost of materials used minus (or plus) increase (or decrease) in inventory of work in progress and consigned goods.
[2] Includes the following costs: Indirect labor, research and experimental royalties, supplies, insurance, heat-light-power, repairs, depreciation taxes, tools and moulds (a), rent (a), miscellaneous (a), and professional services (a). ((a) Means item does not appear in every year.)
[3] Does not include subfactory expense.

NOTE.—For simplicity, petitioner's terminology has been adopted for this schedule.

Petitioner's average sales price, material cost, and direct labor cost of certain products, based on selected sample product numbers, for the years 1939 through 1945 are as follows:

| Year, percent | Small Paper Condensers | | | Filters | | |
|---|---|---|---|---|---|---|
| | Sales price | Material cost | Direct labor cost | Sales price | Material cost | Direct labor cost |
| 1939 | $242.99 | $126.49 | $39.55 | ¹$2,296,377.34 | $817,360.76 | ¹$556,552.89 |
| Percent | 100 | 52.06 | 16.28 | 100 | 35.59 | 24.24 |
| 1940 | $244.55 | $126.49 | $39.55 | ¹$2,125,760.89 | ¹$737,207.02 | ¹$512,217.36 |
| Percent | 100 | 51.72 | 16.17 | 100 | 34.68 | 24.10 |
| 1941 | $414.47 | $172.99 | $67.54 | ¹$4,698,476.67 | ¹$1,698,338.23 | ¹$1,062,979.79 |
| Percent | 100 | 41.73 | 16.30 | 100 | 36.15 | 22.62 |
| 1942 | $1,052.70 | $385.51 | $162.78 | $14,350.00 | $6,593.80 | $1,494.06 |
| Percent | 100 | 36.62 | 15.46 | 100 | 45.95 | 10.41 |
| 1943 | $1,353.65 | $374.24 | $267.95 | $19,450.00 | $9,354.37 | $2,305.62 |
| Percent | 100 | 27.65 | 19.79 | 100 | 48.09 | 11.85 |
| 1944 | $1,903.65 | $510.69 | $363.96 | $6,050.00 | $2,251.01 | $726.50 |
| Percent | 100 | 26.83 | 19.12 | 100 | 37.21 | 12.01 |
| 1945 | $2,073.65 | $561.81 | $428.65 | $26,400.00 | $13,869.53 | $2,467.03 |
| Percent | 100 | 27.09 | 20.67 | 100 | 52.54 | 9.34 |

| Year, percent | Industrial Oil Condensers | | | Resistors | | |
|---|---|---|---|---|---|---|
| | Sales price | Material cost | Direct labor cost | Sales price | Material cost | Direct labor cost |
| 1939 | $1,325.45 | $470.85 | $207.85 | $545.00 | $137.39 | $115.48 |
| Percent | 100 | 35.52 | 15.68 | 100 | 25.21 | 21.19 |
| 1940 | $1,325.45 | $470.85 | $207.85 | $545.00 | $137.39 | $115.48 |
| Percent | 100 | 35.52 | 15.68 | 100 | 25.21 | 21.19 |
| 1941 | $1,830.00 | $731.66 | $137.51 | $545.00 | $137.39 | $125.06 |
| Percent | 100 | 39.98 | 7.51 | 100 | 25.21 | 22.95 |
| 1942 | $134,500.00 | $57,347.98 | $10,724.60 | $40,130.00 | $10,958.29 | $7,050.41 |
| Percent | 100 | 42.64 | 7.97 | 100 | 27.31 | 17.57 |
| 1943 | $144,650.00 | $62,810.40 | $12,670.34 | $58,097.00 | $17,449.82 | $9,358.58 |
| Percent | 100 | 43.42 | 8.76 | 100 | 30.04 | 16.11 |
| 1944 | $168,680.00 | $119,622.25 | $5,265.31 | $16,087.00 | $6,323.81 | $2,059.59 |
| Percent | 100 | 70.92 | 3.12 | 100 | 39.31 | 12.80 |
| 1945 | $16,255.00 | $6,854.92 | $1,905.87 | $14,183.80 | $5,097.19 | $1,677.51 |
| Percent | 100 | 42.17 | 11.72 | 100 | 35.94 | 11.83 |

| Year, percent | Meg-O-Max Resistors | | | Networks | | |
|---|---|---|---|---|---|---|
| | Sales price | Material cost | Direct labor cost | Sales price | Material cost | Direct labor cost |
| 1942 | | | | $120,000.00 | $48,290.94 | $14,486.65 |
| Percent | | | | 100 | 40.24 | 12.07 |
| 1943 | $39,000.00 | $12,631.45 | $1,003.26 | $270,000.00 | $108,321.04 | $33,618.98 |
| Percent | 100 | 32.39 | 2.57 | 100 | 40.12 | 12.45 |
| 1944 | $39,000.00 | $12,631.45 | $1,003.26 | $433,500.00 | $183,368.75 | $32,908.73 |
| Percent | 100 | 32.39 | 2.57 | 100 | 42.30 | 7.59 |
| 1945 | $39,000.00 | $12,631.45 | $1,076.20 | $433,500.00 | $183,368.75 | $35,212.33 |
| Percent | 100 | 32.39 | 2.76 | 100 | 42.30 | 8.12 |

| Year, percent | Transmitting Mica Condensers | | | Wet Electrolytic Condensers | | |
|---|---|---|---|---|---|---|
| | Sales price | Material cost | Direct labor cost | Sales price | Material cost | Direct labor cost |
| 1937 | | | | $1,100.47 | $474.64 | $168.88 |
| Percent | | | | 100 | 43.13 | 15.35 |
| 1938 | | | | $1,056.47 | $473.77 | $163.26 |
| Percent | | | | 100 | 44.34 | 15.45 |
| 1939 | ¹$2,296,377.34 | ¹$817,360.76 | ¹$556,552.89 | $1,006.02 | $472.77 | $174.47 |
| Percent | 100 | 35.59 | 24.24 | 100 | 46.99 | 17.34 |
| 1940 | ¹$2,125,760.89 | ¹$737,207.02 | ¹$512,217.36 | $1,046.81 | $430.68 | $168.06 |
| Percent | 100 | 34.68 | 24.10 | 100 | 41.14 | 16.05 |
| 1941 | $5,341.00 | $1,225.68 | $803.98 | $1,050.78 | $423.66 | $180.83 |
| Percent | 100 | 22.95 | 15.05 | 100 | 40.32 | 17.21 |
| 1942 | $11,300.00 | $2,914.46 | $2,472.64 | ²$1,050.78 | ²$423.66 | ²$180.83 |
| Percent | 100 | 25.79 | 21.88 | 100 | 40.32 | 17.21 |
| 1943 | $10,150.00 | $2,518.53 | $2,238.35 | --- | --- | --- |
| Percent | 100 | 24.81 | 22.05 | --- | --- | --- |
| 1944 | $12,660.00 | $5,162.89 | $1,717.91 | --- | --- | --- |
| Percent | 100 | 40.78 | 13.57 | --- | --- | --- |
| 1945 | $2,560.00 | $907.38 | $445.79 | --- | --- | --- |
| Percent | 100 | 35.44 | 17.41 | --- | --- | --- |

| | D. C. Dry Electrolytic Condensers | | | A. C. Dry Electrolytic Condensers | | |
|---|---|---|---|---|---|---|
| Year, percent | Sales price | Material cost | Direct labor cost | Sales price | Material cost | Direct labor cost |
| 1937 | $1,928.00 | $672.43 | $443.93 | $2,080.20 | $595.88 | $394.35 |
| Percent | 100 | 34.88 | 23.03 | 100 | 28.65 | 18.96 |
| 1938 | $1,720.49 | $517.55 | $429.14 | $2,007.84 | $596.18 | $381.20 |
| Percent | 100 | 30.08 | 24.94 | 100 | 29.69 | 18.99 |
| 1939 | $1,855.89 | $552.83 | $524.98 | $1,810.75 | $519.14 | $407.50 |
| Percent | 100 | 29.79 | 28.29 | 100 | 28.67 | 22.50 |
| 1940 | $2,062.05 | $616.68 | $560.32 | $1,664.69 | $478.39 | $407.50 |
| Percent | 100 | 29.91 | 27.17 | 100 | 28.74 | 24.48 |
| 1941 | $2,435.58 | $722.09 | $626.35 | $1,159.44 | $474.99 | $315.57 |
| Percent | 100 | 29.65 | 25.72 | 100 | 40.97 | 27.22 |
| 1942 | $2,313.90 | $673.33 | $539.18 | $1,964.90 | $858.47 | $316.34 |
| Percent | 100 | 29.10 | 23.30 | 100 | 43.69 | 16.10 |
| 1943 | $2,828.60 | $734.08 | $666.46 | $1,964.90 | $858.47 | $331.28 |
| Percent | 100 | 25.95 | 23.56 | 100 | 43.69 | 16.86 |
| 1944 | $2,191.00 | $507.06 | $513.58 | $1,964.90 | $858.47 | $331.28 |
| Percent | 100 | 23.14 | 23.44 | 100 | 43.69 | 16.86 |
| 1945 | $2,234.78 | $503.32 | $562.76 | $1,964.90 | $858.47 | $352.15 |
| Percent | 100 | 22.52 | 25.18 | 100 | 43.69 | 17.92 |

| | Selkar | | |
|---|---|---|---|
| 1944 | $554.00 | $197.07 | $89.17 |
| Percent | 100 | 35.57 | 16.10 |
| 1945 | $772.30 | $230.95 | $136.41 |
| Percent | 100 | 29.90 | 17.66 |

¹ In some years cost records are not available. In such case, the ratio of material and direct labor to net sales for all products has been used.

² No amounts are in evidence for this item for 1942. Because only a small amount of sales appears in that year, the 1941 amounts have been used.

NOTE.—Some sales prices, labor, and material costs are based on prices per hundred or per thousand. This is immaterial for purposes of this case.

Petitioner's discounts on sales and discounts on purchases for the years 1937 through 1945 were as follows:

| Year | Discount on sales | Discount on purchases | Net discount |
|---|---|---|---|
| 1937 | $52,262.41 | $9,589.51 | $42,672.90 |
| 1938 | 33,119.23 | 6,546.13 | 26,573.10 |
| 1939 | 43,134.32 | 9,089.34 | 34,044.98 |
| 1940 | 37,348.56 | 8,126.14 | 29,222.42 |
| 1941 | 65,895.51 | 17,807.42 | 48,088.09 |
| 1942 | 87,451.36 | 25,025.44 | 62,425.92 |
| 1943 | 159,811.14 | 56,568.44 | 103,242.70 |
| 1944 | 215,297.65 | 78,171.68 | 137,125.97 |
| 1945 | 114,955.89 | 47,294.79 | 67,661.10 |

Petitioner's administrative and general expenses include salaries and wages, traveling, telephone and telegraph, office supplies and expense, professional services, contract termination expense (1945 only), advertising, commissions, freight out, taxes, depreciation, and miscellaneous. Its total administrative and general expenses for the years 1941 through 1945 are as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1941 | $526,604.88 | 1944 | $1,801,018.34 |
| 1942 | 695,421.54 | 1945 | 2,056,137.67 |
| 1943 | 1,373,885.85 | | |

Petitioner's patents and patent applications over the years here involved were for products as well as processes developed by it. Some

of the petitioner's processes were kept secret, in view of the difficulties encountered in proving infringement of a process patent.

Petitioner's costs in processing patent applications were as follows:

| Year | Total internal patent costs | Patent cost apportioned to some class (C) items |
|------|---|---|
| 1937 | $10,067 | $372 |
| 1938 | 6,312 | 101 |
| 1939 | 5,035 | 106 |

Petitioner was charged the following amounts by Arthur G. Connolly, its patent counsel, in connection with the preparation and prosecution of some of its patent applications relating to class (C) items during the years 1942 through 1945:

| Year | Patent preparation charges | Year | Patent preparation charges |
|------|---|---|---|
| 1942 | $30 | 1944 | $535 |
| 1943 | 540 | 1945 | 720 |

None of the above amounts include filing fees.

On November 4, 1943, the petitioner granted a nonexclusive license to P. R. Mallory & Co., Inc., under all of petitioner's resistor patents or patent applications as well as under any resistor patent for which the petitioner was licensed with the right to grant sublicenses. The license provided for a royalty of 4 percent of the net selling price of resistors sold by the licensee, and it also provided that the petitioner was to receive from the licensee a "royalty-free, non-exclusive, and non-transferable license, with the unrestricted right to grant sublicenses thereunder to other licensees or sub-licensees of the inventions referred to in Article I, [electrical resistors using ceramic coated resistor wires], under all patents which * * * [licensee] now or hereafter during the life hereof owns or controls or under which * * * [licensee] is or may be licensed with a right to grant sub-licenses, provided said patents relate to improvements upon the electrical resistors licensed herein or processes for their production and/or use."

From 1933 through 1940 the petitioner recorded on its books as "Research and experimental" expenses the following amounts: $45,898.98, $11,166.31, $5,724.11, $10,941.61, $33,233.74, $22,384.22, $27,197.61, and $29,055.80, respectively. From 1941 through 1945 the petitioner recorded on its books as "Experimental expense" the following amounts: $29,160.58, $22,035.83, $47,953.42, $37,987.76, and $34,141.63, respectively.

In a stock prospectus prepared for the petitioner in March 1945 the petitioner's "Experimental and development expenses" for the years 1942, 1943, and 1944 were listed as $82,637.96, $185,516.47, and $290,917.23, respectively.

In each of the years in question a portion of petitioner's net abnormal income resulted from improvement in business conditions. These portions are as follows: 1941, 55 percent; 1942, 65 percent; 1943, 65 percent; 1944, 55 percent; and 1945, 50 percent.

The total cost of petitioner's research and development for some of its products was as follows:

| Item | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mineral oil condensers | $321.35 | $752.00 | $812.76 | $1,120.42 | $281.94 | $168.94 | $585.22 | $635.71 | $512.15 | $365.60 |
| Castor oil condensers | 321.35 | 752.00 | 812.76 | 1,120.42 | 281.94 | 0 | 157.41 | 346.41 | 507.15 | 0 |
| Vitamin Q condensers | 321.35 | 752.00 | 812.76 | 1,120.42 | 281.94 | 394.45 | 788.94 | 1,003.59 | 373.09 | 390.60 |
| Transmitting mica condensers | 770.81 | 2,337.62 | 1,877.44 | 2,876.06 | 65.00 | 0 | 0 | 0 | 1,108.50 | 0 |
| Resistors (exclusive of Meg-O-Max) | 13.58 | 848.56 | 3,161.72 | 2,396.82 | 497.07 | 2,386.52 | 2,483.37 | 6,946.47 | 5,157.20 | 3,459.14 |
| Filters | 1,133.71 | 1,762.48 | 2,677.69 | 2,129.92 | 0 | 0 | 0 | 0 | 0 | 0 |

Some part of petitioner's income for the years 1941 through 1945 resulted from research or development by petitioner of tangible property, patents, formulas or processes, or any combination of the foregoing extending over a period of more than 12 months within the meaning of section 721.

## OPINION.

Petitioner seeks relief under section 721 for the years 1941 through 1945. That section deals generally with abnormalities in income in excess profits tax years. Section 721(b) provides for the determination of "the net abnormal income" that is attributable to previous or future years and section 721(c) provides for the computation of tax in the current years. The applicable portions of section 721 are set forth in the margin.[3]

---

[3] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

*  *  *  *  *  *  *

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; or

*  *  *  *  *  *  *

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross

Petitioner has elected to claim relief under section 721(a)(2)(C). It contends it received income from some of its products during the years in question resulting from research and development which extended over a period of more than 12 months.

Respondent on brief presents a computation of net abnormal income based on what he calls a royalty equivalent theory. This, in substance, is based on a finding of what would have been a reasonable royalty rate if petitioner had granted a nonexclusive license to manufacture and sell the items in question and the application of such rates to stipulated sales figures. Petitioner states on brief it would agree to the use of a royalty equivalent method of determining abnormal income if a higher exclusive license royalty rate were used. However, we find nothing in the statutes, regulations, or decided cases which sanctions such a method of arriving at net abnormal income when actual royalty income is not present.[4] Respondent's method results in small amounts of net abnormal income attributable to prior years for 4 of the 5 years in question. Since we do not agree with respondent's method, we will discuss the various steps to be considered in computing net abnormal income attributable to prior years in the manner set forth in the statute and regulations and in our prior opinions dealing with this statute.

The parties are not in complete agreement as to which of about 30 products petitioner manufactured gave rise to abnormal income from research and development (sometimes referred to herein as class

---

income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributable to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income of a previous taxable year.

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

[4] In *W. B. Davis & Son, Inc.*, 5 T.C. 1195, we held that royalty income actually received was the measure of class (C) income.

(C) income). Petitioner alleged and argues that it is entitled to relief for the following six researched items: (1) Oil impregnated condensers, (2) resistors, (3) transmitting mica condensers, (4) networks, (5) filters, and (6) Selkar condensers (including Prokar condensers).

The parties agree these six categories gave rise to class (C) income but respondent argues that another item, electrolytic condensers, resulted from petitioner's research and development, gave rise to class (C) income during each of the years 1937 through 1940, and so must be included in the aggregate income of the class determined for each of those years. In addition, respondent contends that category (1) above must be broken down into mineral oil, castor oil, and Vitamin Q condensers.

Respondent points out that section 721(a)(2) specifically requires the inclusion of all the income which is classifiable under the statutory class of income elected by the petitioner, citing *Rochester Button Co.*, 7 T.C. 529, and argues electrolytic condensers qualify for this class. Section 721(a)(1) provides that the term "abnormal income" includes "income of any class" if it is abnormal for the taxpayer to derive the amount of income of that class. Section 721(a)(2)(C) makes no provision for exclusion of any item of the class on the grounds that the item had ceased to produce an "abnormal" amount of income. Indeed, this was the argument of the taxpayer which we rejected in *Rochester Button Co.*, *supra*. The record shows that electrolytic condensers were products of petitioner's research and development. Since petitioner has elected to seek relief under section 721(a)(2)(C) he must include all items to which the class definition applies.[5] Respondent does not argue, and we do not believe, that petitioner's failure to formally include the electrolytic condenser item in its class (C) income amounts to a failure of its burden of proof. There is sufficient evidence in the record to permit the computation of the net sales and the gross profit for this item. Any lack of evidence as to this item merely works against petitioner in the final computation.

---

[5] Nothing in Regulations 112, sec. 35.721–3, is contrary to this. That section provides in part:

A taxpayer claiming the benefits of section 721 shall file with its excess profits tax return a detailed statement in duplicate containing the following information:

(1) the amount and a description of each class of income claimed to be abnormal, and the amount and a description of each item in each such class;

(2) for each class of income claimed to be abnormal, the amount and a description of each item of income of the same class derived during the four taxable years immediately preceding the taxable year, and the aggregate amount of such items for each taxable year; * * *

On the contrary, it would seem that this section supports the respondent's position. It is necessary for computing the 4-year average as well as for computing net abnormal income itself that *all* items of the class be included.

Respondent contends that electrolytic condenser net sales are to be included in class (C) income only in the years 1937 through 1940. To do so would result in a distortion of the income of the class for the years 1941 through 1945 unfavorable to petitioner. We feel that net sales of electrolytic condensers must be included for the years 1941 through 1945 as well and hold electrolytic condensers will be included as an item of class (C) income.

Respondent next argues that the oil impregnated condensers, which petitioner groups into one category, should be treated as three separate class (C) items, i.e., mineral oil, castor oil, and Vitamin Q. We agree. Petitioner had research and development activity during the years in question relating to these three items and this activity was not evenly distributed among them during these years. The record further shows that the production of castor oil condensers ceased in 1944. This, coupled with the testimony of Sprague, petitioner's principal officer, that petitioner had a backlog of about 30 percent on its orders during the war years, leads to the inference that there were no sales of castor oil condensers during 1945. Because these items were subject to varying periods of research and development, and not all of them were sold during each of the years in question, it is necessary for purposes of attribution to other years to consider them as separate items. See Regs. 112, sec. 35.721–1; sec. 35.721–3, and the discussion below. Because petitioner treated them as one item, a problem is presented as to the breakdown of various amounts assigned to them for sales and costs. Where necessary we have made such allocations as appeared proper based on the entire record and our best judgment.

At trial petitioner offered evidence of still another item of class (C) income, the Meg-O-Max resistor. Although there is no direct reference to this kind of resistor in either the claims or the pleadings the petition does generally place resistors in issue and respondent on brief concedes that it is in issue. We believe this is sufficient to place this item in issue. See *H. S. McClelland, Inc.*, 14 T.C. 45; *Soabar Co.*, 7 T.C. 89.

However, although petitioner argues to the contrary, we feel that it has not met its burden of proof that the Meg-O-Max resistor was the product of its own research and development. Podolsky was the inventor and developer of Meg-O-Max and this development took place about 1941 and 1942. Petitioner argues that Podolsky was its employee at the time and that it had "the usual contract with him covering any developments made by him." The evidence on which petitioner relies consists of an alleged contract between it and Sprague Products Company, Podolsky's notebooks in which he described his research, a letter to the Navy over Podolsky's name, and the testimony of Sprague.

The contract to which petitioner refers is a letter from Sprague as

petitioner's president to the Sprague Products Company dated October 11, 1937. This letter is as follows:

Confirming verbal discussion on Friday, if you can make successful arrangements with Mr. Leon Podolsky, and provided approximately one-half his time is available *during the first year* of his association with your company, to assist us in engineering and manufacturing problems connected with the new Ruben resistor, we are agreeable to reimbursing your company $50 per week *for this period* plus any travelling expenses which he may incur in our manufacturing interest, with the understanding that any improvements which he may make in these resistors, their process of manufacture, or machines used in their manufacture will be the property of the [petitioner]. [Emphasis added.]

There is also in the record a copy of a letter to the Navy in June 1941. The signature block of the letter is as follows:

SPRAGUE SPECIALTIES COMPANY
Leon Podolsky
Research Engineer
Resistor Division

In response to a question as to whether petitioner had a written employment agreement with Podolsky at any time during the years 1937 through 1945, Sprague testified on cross-examination that in his "recollection" petitioner had the "usual form of employment agreement" and that there were invoices and records covering payments to Podolsky. Neither the employment agreement nor other records on this point were introduced in evidence.

Podolsky kept records of his research in laboratory notebooks. None of his notebooks were introduced in evidence. A sample of the laboratory notebooks issued by petitioner to another person carries the statement "This note book is the property of the Sprague Specialties Company [petitioner]" on its cover. There is no evidence that Podolsky's notebooks were the same as the sample.

Respondent argues that Podolsky was an employee of Sprague Products Company and not of petitioner when he developed the Meg-O-Max resistor. In 1946 Podolsky submitted a sworn affidavit in connection with petitioner's income and excess profits tax liability which provides in part as follows:

I was employed by Sprague Products Company during the year 1941 as research engineer under an agreement which provided, among other things, that I would assign to that company any patents developed by me in the course of my employment.

    \*       \*       \*       \*       \*       \*       \*

I have examined my laboratory notebooks covering the year 1941, \* \* \* and \* \* \* I hereby state that \* \* \* not more than 100 hours during that year were spent on the development of the patents in question or any of them.

The balance of my time during the year 1941 was devoted primarily to building up a market for and promoting sales of radio interference eliminators, [etc.]. This involved considerable travelling, lecturing, and consulting with customers and prospective customers of Sprague Products Company.

In addition, my activities in 1941 included the preparation of catalogues and manuals regularly issued by Sprague Products Company and the handling of inquiries from customers in connection with the use of condensers and other devices sold by the company.

Two patents, referred to in our Findings of Fact, were applied for in February 1943 and subsequently issued to Podolsky as "assignor to Sprague Products Company." At one place in its brief in discussing another point, petitioner says "Podolsky left the payroll of petitioner at the end of 1940 and thereafter worked as a sales engineer paid entirely by Sprague Products * * *." We feel it is very significant that this record shows Podolsky was in the courtroom during the hearing of this case, but he was not produced by petitioner as a witness.

On this record we are of the opinion that petitioner has failed to prove that Podolsky was in its employ when he developed the Meg-O-Max resistor, or that it was in any way entitled to the results of his research on Meg-O-Max resistors. Regulations 112, sec. 35.721–7, require that the "research, or development must be that of the taxpayer." No amount of income from the sale of Meg-O-Max resistors may be included in petitioner's abnormal income. See *Electronic Mechanics, Inc.*, 15 T.C. 489; *L. E. Carpenter & Co.*, 29 T.C. 562.

Although, as the findings of fact show, there were several types of resistors (not including Meg-O-Max), both their sales and the research related to them were largely contemporaneous for the several types. Neither party suggests that it is necessary to treat each of the types of resistor as a separate class (C) item, and we believe that no useful purpose would be served by doing so.

There are thus nine items [6] which are to be included in the determination of class (C) income. We have set forth the net sales of each of these items in our Findings of Fact. In the discussion which follows we will explain how we arrived at our conclusions with respect to net sales figures.

Petitioner, in its computation of net sales for each class (C) item for the year 1944, has reduced the stipulated net sales to represent the reduction of the total net sales by $442,970 for a renegotiation adjustment. Nowhere in the record of this case does the reduction factor which petitioner applied to the net sales of each item appear. Without evidence of the manner in which the reduction was arrived at, we cannot accept petitioner's amounts of net sales of each class (C) item for 1944. Yet it is clear that petitioner is entitled to a per-item adjustment for the amount by which renegotiation decreased its total net sales. In 1946 petitioner filed a second amended tax return for

[6] These are: Mineral oil condensers, castor oil condensers, Vitamin Q condensers, resistors (not including Meg-O-Max), transmitting mica condensers, networks, filters, Selkar condensers (including Prokar), and electrolytic condensers.

its taxable year 1944. This return contained a schedule [7] showing an itemized reduction of sales resulting from the renegotiation agreement. On the Rule 50 computation the parties will reduce petitioner's net sales for each product in 1944 in the manner set forth in said schedule,[8] using the amounts and categorizations which appear in this opinion. See *Toledo Engineering Co.*, 14 T.C. 765.

Petitioner presented evidence of net sales of the oil impregnated condensers on the assumption that they were to be treated as a single item. We have above accepted respondent's argument that mineral oil, castor oil, and Vitamin Q condensers must be treated separately. Evidence as to the separate items is sparse. Net sales figures for petitioner's products are stipulated as they appeared on its books. The net sales figures which include, among other things, the three condenser items, are headed "Paper Tubular Condensers," "K.V.A." (Kilovolt Ammeter), and "Sales—Industrial Paper." Robinson, petitioner's research director, testified that the stipulated paper tubular condenser amounts should be allocated to the newly developed oil impregnants as follows: Zero in 1938, one-fourth in 1939, one-third in 1940, and one-half in 1941 through 1945. Sprague testified that the portion of the paper tubular condenser sales figure which related to the items here in question "were mostly mineral oil, some Vitamin Q. I don't remember any castor oil." Robinson further testified that the castor oil condensers were made in petitioner's industrial oil

[7] Said schedule was as follows:

SUMMARY OF SALES OF NEW PRODUCTS AND OTHER PRODUCTS BEFORE
AND AFTER RENEGOTIATION

*Calendar Year 1944*

| | Total sales before renegotiation | Percentage of each class to total sales | Reduction of sales per renegotiation agreement | Total sales after renegotiation |
|---|---|---|---|---|
| New products | $10, 958, 077. 31 | 52. 68 | $233, 356. 60 | $10, 724, 720. 71 |
| Other products | 9, 842, 642. 36 | 47. 32 | 209, 613. 40 | 9, 633, 028. 96 |
| Total | 20, 800, 719. 67 | 100. 00 | 442, 970. 00 | 20, 357, 749. 67 |

(a) Sales of new products before renegotiation_____ 10, 958, 077. 31

(b) Sales of new products after renegotiation_____ 10, 724, 720. 71

(c) Ratio of (b) to (a) _____ 97.8704603%

| | Total sales before renegotiation | Percentage of sales after renegotiation to sales before renegotiation | Total sales after renegotiation |
|---|---|---|---|
| Industrial paper capacitors | $2, 604, 041. 17 | 97.8704603 | $2, 548, 587. 08 |
| Resistors | 2, 552, 415. 61 | " | 2, 498, 060. 92 |
| Transmitting, mica condensers | 891, 263. 90 | " | 872, 284. 08 |
| Filters | 968, 114. 92 | " | 947, 498. 53 |
| Networks | 2, 809, 482. 19 | " | 2, 749, 653. 15 |
| Selkar condensers | 1, 132, 759. 52 | " | 1, 108, 636. 95 |
| Total | 10, 958, 077. 31 | | 10, 724, 720. 71 |

[8] It will be noted that the items comprising the "new products" category on the schedule differ in kind and amount from those used in this case. Neither difference is significant for the purpose of this case. The amounts arrived at in this case will be used for the class (C) items.

department and Sprague testified that the breakdown of the sales—industrial paper figure was "much more uniform" among the three items. In its computations in this case, petitioner has included the amounts in the K.V.A. account in sales of industrial oil condensers for the years 1939 through 1945. The stipulation shows sales listed for the K.V.A. account on petitioner's books beginning in 1936. Petitioner makes no explanation on brief for the inclusion of these amounts and the only explanation we have found in the record is that kilovolt ammeter is an expression which designates polyfactor correction condensers.

Based on the entire record, we have set forth the breakdown of net sales between mineral oil, castor oil, and Vitamin Q condensers in our findings of fact. These amounts were arrived at as follows: The stipulated account "Paper Tubular Condensers"[9] contains net sales of both mineral oil and Vitamin Q condensers. These are to be distributed as follows: 1937 and 1938, no net sales of either mineral oil, castor oil, or Vitamin Q condensers; 1939, one-quarter of the stipulated figure represents net sales of mineral oil condensers; 1940, one-third of the stipulated amount represents net sales of mineral oil condensers; 1941, one-half of the stipulated figure represents net sales of mineral oil condensers; 1942 through 1945, one-half of the stipulated figure represents net sales of mineral oil and Vitamin Q condensers. In 1942, $5,000 of this amount represents net sales of Vitamin Q condensers and the rest net sales of mineral oil condensers; for 1943 through 1945, $10,000 of this amount represents net sales of Vitamin Q condensers and the remainder net sales of mineral oil condensers.

The account on petitioner's books stipulated as "Sales-Industrial Paper"[10] was not established as a separate account on petitioner's books until 1940. Although the record shows there were net sales of castor oil condensers in 1939, there is no evidence from which the amount can be determined. Accordingly, $20,000 will be considered to be the net sales of that item for that year. The stipulated amounts of net sales for the "Sales-Industrial Paper" account for the years 1940 and 1941 will be divided equally between mineral oil and castor oil condensers. The stipulated amount in this account for 1942 will

---

[9] The account "Paper Tubular Condensers" contains the following stipulated net sales amounts:

| | | | |
|---|---|---|---|
| 1937 | $944, 373. 74 | 1942 | $2, 516, 495. 90 |
| 1938 | 714, 033. 03 | 1943 | 4, 618, 572. 41 |
| 1939 | 900, 624. 10 | 1944 | 5, 751, 643. 37 |
| 1940 | 943, 861. 58 | 1945 | 2, 492, 540. 42 |
| 1941 | 1, 611, 094. 76 | | |

[10] The account "Sales-Industrial Paper" contains the following stipulated amounts of net sales:

| | | | |
|---|---|---|---|
| 1940 | $62, 568. 26 | 1943 | $2, 174, 636. 22 |
| 1941 | 624, 372. 22 | 1944 | 2, 599, 304. 88 |
| 1942 | 788, 579. 75 | 1945 | 1, 690, 550. 46 |

be reduced by $150,000, the net sales of Vitamin Q condensers, and the remaining amount will be divided equally between mineral oil and castor oil condensers. For the years 1943 and 1944 the stipulated amounts in this account will be divided equally among castor oil, mineral oil, and Vitamin Q condensers. For the year 1945 the amount in said account will be divided equally between mineral oil and Vitamin Q condensers.

There is insufficient evidence to connect the stipulated net sales of the K.V.A. product [11] with prior research and development of petitioner's oil impregnants. The stipulated amounts in the K.V.A. account will be disregarded for purposes of this case.

The net sales figures for electrolytic condensers are stipulated for three product types; dry d.c., dry a.c., and wet. On the facts of record, there is no necessity for considering these types individually. Thus, in our Findings of Fact we have set out the aggregate net sales of the three types. The parties will do the same in the Rule 50 computation.

The record discloses no necessity for separate treatment to be given Selkar and Prokar condensers. References herein to Selkar will be understood to include Prokar unless the contrary appears.

An unexplained discrepancy appears in the stipulated amounts of net sales of resistors for 1945. The stipulated "NET SALES PER THE BOOKS" which lists net sales of all petitioner's products lists "Sales-Resistors" of $2,099,823.72, and "Sales—Meg-O-Mac [sic] Resistor" of $626,103.88. The total of these amounts is $2,725,927.60. The stipulation also contains a schedule, "Net Sales per Ledger Coding" which sets out the sales of resistors alone for the years 1939 through 1945. This schedule lists 1945 total resistor net sales other than Meg-O-Max of $1,877,080.87 and net sales of Meg-O-Max of $626,103.88. These two items total $2,503,184.75. The commissioner who heard this case relied on the latter set of figures without objection from either party. We have accordingly set forth the latter schedule in our Findings of Fact and the parties will use the amounts contained therein in the Rule 50 computation.

The net sales of the other items in issue, i.e., transmitting mica condensers, networks, filters, and Selkar condensers, are stipulated. We have set these amounts forth in the Findings of Fact.

After finding the net sales for each of the items in question, it is next necessary to determine the amount of gross profit for each of them. Petitioner's accounting system is not tailored to show these

---

[11] The account K.V.A. contains the following stipulated amounts of net sales:

| | | | |
|---|---|---|---|
| 1937 | $45,326.27 | 1942 | $59,472.74 |
| 1938 | 52,252.46 | 1943 | 40,753.28 |
| 1939 | 67,604.66 | 1944 | 39,877.47 |
| 1940 | 25,803.72 | 1945 | 42,164.11 |
| 1941 | 28,757.59 | | |

amounts.[12] Cost cards were kept for some of its products but there was no business necessity for determining cost totals for each separate product. Sales were recorded on its books by manufacturing departments, but these did not always conform to the class (C) items involved in this case. Costs were not segregated on the books by departments or by products but were shown by the nature of the expenditure. Thus petitioner, to reduce the net sales of class (C) items to gross profit, has had to reconstruct costs of class (C) items by allocating general costs from its income statements to the class (C) items. In so doing petitioner chose cost cards which were representative samples of the product group which forms each class (C) item.[13] From these cost cards, material cost and direct labor cost were then related as percents of the sales price of the product. From these were determined the average percents of material cost and direct labor cost for each class (C) item for each year. We have set forth these figures in our Findings of Fact. The percents for each item were then applied to the net sales of the item for each year. Petitioner calls the resulting amounts "computed material [or direct labor] cost." These computed amounts were then totaled and compared to the actual material and actual labor costs as shown on petitioner's books and stipulated by the parties. Because the computed material and labor costs were based in part on estimates, an "error" factor was determined which was then applied to each of the computed costs to arrive at "actual material [or direct labor] cost prorated" for each item for each year. In addition, petitioner prorated factory overhead [14] to each item by applying a ratio to the actual direct labor cost

[12] A standard cost accounting system was established for petitioner in 1941. Prior to that time it had made some cost studies of the products produced. Between the years 1941 and 1946 it was the responsibility of the cost accounting department to determine the costs of various products which the petitioner manufactured. To do this they would start with the specification of a given product, determine the amount of materials used to manufacture it, determine from purchasing department records the cost of the material, then apply to it labor rates based on time studies. Also taken into account were amounts of wastage encountered in the production process. The resulting figures would be entered on cost cards which were used in petitioner's business in determining cost of sales, pricing of inventories and in determining the sales price of its products. Cost cards were not prepared for every product, nor were they always prepared at the time the item was produced. For instance, some cost cards were prepared for the purpose of other issues in this case about 5 years after the product had been manufactured, and others were prepared for the purpose of the issue now before the Court, some 4 or 5 years after the product was produced. Most of the component elements appearing on the cost cards represented estimated costs rather than actual ones: Indirect labor, wastage, inventory cost, and others were estimated.

[13] Because of petitioner's view of the case, these estimates of costs have not been allocated among mineral oil, castor oil, and Vitamin Q condensers. Where necessary, such allocation will be made on a proportional basis using the amounts and ratios determined for oil impregnated condensers as a whole.

[14] Factory overhead was computed by petitioner as the total for each year of the following items appearing on the stipulated income statements:
Indirect labor; Experimental expense [described as research and experimental on the stipulated income statement for some years], professional services [1]; Tools and molds [1]; Royalties; Supplies; Insurance; Heat, light and power; Rent [1]; Repairs; Depreciation; Taxes; Miscellaneous.[1]
[1] Does not appear in all years.

prorated. This ratio was arrived at by comparing the total actual factory overhead to the total actual direct labor cost. The three final cost figures were then totaled to arrive at a total factory cost for each item. The total factory cost (materials, labor, and factory overhead) was then subtracted from net sales to arrive at gross profit for each item.[15]

Respondent objects to this computation of gross profit for each item on a number of grounds all of which concern the methods used in arriving at the amount of gross profit. Two of respondent's objections are of some merit. The first is that petitioner's policy of allowing a 1 percent discount for prompt payment is not reflected in the computation for the years 1941 through 1945. The amounts of discounts on sales are shown in petitioner's stipulated income statements. There is no evidence to show that the discounts on sales did not relate at least in part to the class (C) items. On the basis of the whole record, we think that they should be reflected in the computation of net sales. We made a similar adjustment in *Ramsey Accessories Manufacturing Corporation*, 10 T.C. 482. The income statements also show discounts on purchases. We believe that they should also be taken into account. Therefore, in each of the years 1937 through 1945 discounts on purchases will be subtracted from discounts on sales and the net discount figure resulting will be used to decrease net sales for each of the class (C) items in the proportion the net discount figure bears to the total net sales in each year.

Respondent's second objection is that subfactory expenses have not been charged to specific items, but have been spread over all items

[15] An example may serve to illustrate: For the year 1939 one of the items in petitioner's computation was entitled "Newly developed small paper condenser." (This item includes mineral oil and castor oil condensers.) The net sales of this item for 1939 according to petitioner's computation were $233,843.10. The cost cards for six product numbers of this item showed a total sales price (for all six product numbers) of $242.99, total material cost of $126.49 and total direct labor cost of $39.55. Material cost to sales price was then computed as 52.06 percent and labor cost to sales price was computed as 16.28 percent. These percents were then applied to the net sales of the item resulting in a computed material cost of $121,738.72 and a computed direct labor cost of $38,069.66. The computed material costs and the computed labor costs of all items produced by petitioner in 1939 were then totaled. The totals were $832,212.29 for computed material cost and $521,743.02 for computed direct labor cost. These totals were then compared with the total actual material cost per books of $817,360.76 and the total actual direct labor cost per books of $556,552.89 and "error" ratios arrived at for each. The ratios so arrived at were then applied to the computed material cost to arrive at actual material cost prorated of $116,259.25 and to the computed direct labor cost to arrive at actual direct labor cost prorated of $39,486.15. The total factory overhead per books was compared with the total actual direct labor cost per books and a ratio arrived at. This ratio was then applied to the amount of actual direct labor cost prorated for the item and the resulting $28,354.08 was considered the actual factory overhead prorated on the direct labor of the item. Petitioner then totaled actual material cost prorated, actual direct labor cost prorated and actual factory overhead prorated on direct labor to arrive at total actual factory costs of $184,099.48 for the item newly developed small paper condensers. This amount was subtracted from the amount of net sales to arrive at a gross profit of $49,743.62 for the item. This computation was repeated for each item for each of the years 1939 through 1945, with the exception of several variations on items for which cost cards were not available, which it is unnecessary to detail here.

without showing to which they applied. Respondent's argument has merit. Petitioner's treatment of these items does not result in the best estimate available. Although there is scant evidence on this point, it appears from the stipulation [16] that the expenses of Blake Manufacturing related solely to filters, and those of Vermont Marble related solely to transmitting mica condensers. To spread these amounts over all of the products produced, as petitioner's computation does, is clearly erroneous. In addition, it fairly appears from the stipulation that the amounts paid Spaulding and the Nashua Paper Company applied in large measure to the class (C) items here in question. The stipulation gives no clue as to the application of expenses paid the Rogers Lunt Company or the Rock of Ages Corporation. On the basis of the discussion above, the expenses will be treated as follows:

(1) Subfactory expenses of the Blake Manufacturing Corporation will be applied solely to filters in the amounts shown for each of the years 1943, 1944, and 1945 in determining the gross profit for that item for those years.

(2) Subfactory expenses of the Vermont Marble Company will be applied solely to transmitting mica condensers in the amounts shown for each of the years 1943, 1944, and 1945 in determining the gross profit for that item for those years.

(3) Subfactory expenses of Spaulding, Inc., will be allocated among all the capacitor items, including Selkar and Prokar, and networks but not including mica condensers, sold by petitioner during the years 1943, 1944, and 1945, whether class (C) items or not, on the basis the expense bears to the total net sales of all items to which it applies.

(4) Subfactory expenses of the Nashua Paper Company will be allocated among all the resistor items sold by petitioner during the years 1943, 1944, and 1945.

---

[16] The parties have stipulated the amounts of subcontractors' [1] expense for the years 1943, 1944, and 1945, the firms which received the amounts and the products which each firm produced, as follows:

| Firm | Product | Amount paid | | |
|---|---|---|---|---|
| | | 1943 | 1944 | 1945 |
| Blake Manufacturing Corp. | Complete assembly of radio noise suppression filters. | $200,605.25 | $312,527.76 | $161,355.72 |
| Vermont Marble Co. | Mica preparation | 227,706.39 | 494,680.59 | 143,552.40 |
| A. G. Spaulding & Bros., Inc. | Metal encased paper capacitors, paper annulars, and Selkar capacitors. | 94,943.67 | 1,179,887.02 | 2,172,898.69 |
| Nashua Paper Co. | Wire wound Navy type power resistors. | 31,365.84 | 519,167.25 | 234,497.71 |
| Rogers Lunt & Bolen Co. | Subassemblies for "bathtub" type capacitors. | | 107,074.73 | 107,151.73 |
| Rock of Ages Corp. | Not specified | | | 182,109.60 |
| Total | | 554,621.15 | 2,613,337.35 | 3,001,565.85 |
| Grand total subfactory expense | | | | 6,169,524.35 |

[1] Although the stipulation refers to these expenses as "subcontractors'" expense, they relate to petitioner's subfactories as described in our findings of fact.

(5) Subfactory expenses of the Rogers Lunt Company and the Rock of Ages Corporation will be allocated among all products sold by petitioner during the years where applicable, whether class (C) items or not.

Apart from the adjustments just discussed, respondent has introduced no evidence which would serve to seriously contradict the amounts or method which petitioner has used in arriving at gross profit of the class (C) items. Neither has respondent submitted any alternative, either in amount or in method, which would tend to correct the shortcomings he alleges petitioner's computation to contain. Although we realize that the end result of petitioner's computation is largely an estimate, we think on this record it is an informed one. Petitioner points out, and we agree, that it was under no business or tax law necessity to maintain a system of accounts which would show to the penny the gross profit on each of the many items it produced. Petitioner's computation of gross profit was made from figures appearing on its books and records kept in the normal course of its business (with the exception of some of the cost cards which were made for the express purpose of this computation). It was made by petitioner's accounting personnel who testified as to how it was done. If respondent seeks to challenge these figures, he must do so affirmatively for petitioner has done enough to shift to respondent the burden of going forward as to the computation of gross profit of the class (C) items. *Keystone Brass Works*, 12 T.C. 618; *Rochester Button Co., supra.* Since he has not done so, we accept these gross profit figures subject to the adjustments which appear in this opinion.

Petitioner's computation of gross profit for its class (C) items covers the years 1939 through 1945 and from this it is possible to arrive at the gross income of the class. However, section 721(a)(3) provides for a deduction from the gross income of the class of 125 percent of the average of the gross income of the same class for the 4 years preceding the taxable year in question. Thus, gross income from the items in question must be computed for the years 1937 and 1938, insofar as there is income from them for those years. The stipulation discloses net sales of electrolytic condensers and a small amount of resistors which we have included in our Findings of Fact. Petitioner has shown amounts from which costs can be determined for the years 1937 and 1938 for electrolytic condensers. No evidence of costs appears for resistors in 1938. For this item the ratio of costs to net sales during the years for which there is proof available will be averaged and applied to net sales of the item for 1938 to arrive at gross profit for the item.

Respondent next argues that the petitioner must isolate that portion of the gross profit from its products which flowed from income-producing factors other than research and development, such as

management, goodwill, trademarks, and enhanced physical assets, citing *Ramsey Accessories Manufacturing Corporation, supra.* In addition, on the basis of *Ramsey*, respondent contends that a substantial portion of the gross profit from Selkar and Vitamin Q condensers and Koolohm resistors must be eliminated from the computation because these items depended heavily on patents not developed by petitioner. Taking the second of respondent's contentions first, we think if the research of others, or the use of the patents of others, contributed to the petitioner's profit, it has already been taken into account in arriving at gross profit, or is of such a nature that it was in the public domain and is therefore immaterial. Royalties paid and salaries of petitioner's research people have already been included as a cost in arriving at the gross profit for each of the items in question. Respondent argues that Selkar and Vitamin Q condensers would not have been possible without chemical patents developed by I. G. Farben, which only became available to petitioner as a result of the war. As will appear below, there is no necessity to discuss Selkar. Petitioner's evidence makes it clear that the chemicals used under the I. G. Farben patents for Vitamin Q condensers were the subject of substantial further research by petitioner, and so are to be treated as any other component of the item, such as the common paper or the common casing which surrounded it. Respondent argues that the Koolohm resistor depended on the Samuel Ruben patents. Petitioner has shown that it did significant research in the application of these patents to its products, and any amount attributable to the patents is measured by and excluded from gross profit on the basis of royalties paid.

There remains for consideration the amount of gross profit, if any, which is to be attributed to other factors outlined in the *Ramsey* case. *Ramsey* dealt with a claim for section 721 relief by a piston ring manufacturer. We there found, among other things, that the plant and equipment account of the taxpayer increased during the years prior to the years in question and somewhat less during those years. In addition we also pointed out that in prior years there had been an exceptionally large number of returns of piston rings of other types and a smaller return of the rings which formed the class (C) items The Court accepted the respondent's argument that some "part of an increase in profits could properly be attributed to management" and to the proven increase in plant, equipment, and capacity. Petitioner has ignored any argument in this area in its presentation of evidence and on brief. Respondent makes no helpful quantitative suggestion as to how to make the necessary allowance for these factors. The record on this point is somewhat sparse. It contains no description of petitioner's sales mechanism, no specific showing of extraordinary efficiency on the part of its management, nor is there clear evidence

of goodwill. The record does demonstrate, however, that petitioner expanded its physical facilities markedly and subcontracted out some of its work. The stipulated balance sheets for the years in question show an increase in petitioner's fixed assets account during the years in question.[17] We realize that it is a difficult burden for petitioner to show negatively that no other factors gave rise to some part of the income in question, and, indeed, on the facts of the case, we do not believe that he could do so with much precision. On the other hand, we are convinced that some adjustment must be made. In the complete absence of proof of any amount which should be assigned to compensate for the factors other than research and development which gave rise to gross profit, in the exercise of our best judgment, and on the basis of the entire record, for each of the class (C) items the gross profit of the item as arrived at under this opinion will be reduced by an amount equal to 10 percent of such gross profit to take into account factors other than research and development which gave rise to net abnormal income as required by the *Ramsey* case.

When the gross profit for each item, and for the class, is determined, the amount of such gross income of the class for each of the 4 years preceding each of the taxable years in question, is totaled, averaged, and multiplied by 125 percent. Secs. 721(a) and 721(a)(3). If the class (C) income of each taxable year is in excess of the product of this computation, then there is abnormal income in that year and the gross income of the class becomes known as abnormal income.[18] It is next necessary to arrive at net abnormal income, because it is this amount that is available for attribution to other years.

Section 721(a)(3) provides that the product arrived at by applying the 125 percent test shall be subtracted from abnormal income. This is to be done for both the income of the class, Regs. 112, sec. 35.721–1(a)(2), and for each item of abnormal income, Regs. 112, sec. 35.721–1(b)(1).[19]

---

[17] The stipulated balance sheets show that the account "Fixed Assets—Less Reserve" had the following balances as of Dec. 31 of the years indicated:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1937 | $419, 497. 73 | 1942 | $426, 134. 56 |
| 1938 | 331, 795. 76 | 1943 | 621, 186. 90 |
| 1939 | 314, 310. 55 | 1944 | 716, 390. 99 |
| 1940 | 364, 785. 83 | 1945 | 752, 755. 99 |
| 1941 | 418, 057. 67 | | |

[18] If there is abnormal income, then the 125-percent computation must be made for each class (C) item. Although neither the statute nor the regulations specify exactly how to determine an item of abnormal or net abnormal income, it is clear from Regulations 112, sec. 35.721–1, that items are the components which go to make up the class of abnormal or net abnormal income. Therefore, each of petitioner's class (C) products (which we have sometimes referred to herein as items) will be considered to give rise to an item of abnormal and net abnormal income where such appears from this opinion.

[19] Regulations 112, sec. 35.721–1(b)(1), also provide that the 125-percent deduction cannot reduce an item of abnormal income below zero. We note that petitioner, in its computation in several instances, seems not to have followed this rule.

Section 721(a)(3) then provides for the further reduction of abnormal income by ratable "direct costs or expenses" other than the direct costs and expenses deducted in arriving at gross income (of the item and of the class). Again, this is to be done for both the income of the class, Regs. 112, sec. 35.721-1(a)(3), and for each item of abnormal income, Regs. 112, sec. 35.721-1(b)(2).

Petitioner argues that the direct costs to be deducted are limited to selling expenses [20] and do not include administrative and general expenses, citing *Rochester Button Co., supra.* Respondent argues that because general and administrative expenses, as well as selling expenses, are deductible in determining normal tax net income, a proportionate part of such expenses must be deducted as direct expenses in arriving at net abnormal income from research and development, citing *General Tire & Rubber Co.*, 29 T.C. 975 (1958). In the *General Tire* case, after setting forth the taxpayer's profit and loss statements for the years in question, we said:

Textileather, on its profit and loss statements for the years 1942 through 1945, has allocated a portion of its administrative expenses as an item of cost incurred in the production and sale of Tolex. We accordingly have adjusted taxpayer's computation of its net abnormal income from Tolex for each year here involved by an amount representing the indicated proportional part of its administrative expenses as an applicable item of direct cost.

The *Rochester Button* case is distinguishable because in that case we pointed out that there was no evidence on this point. There is nothing in the language of section 721(a)(3) which indicates that a restrictive meaning should be accorded to the word "direct." On the contrary, its plain meaning, in context, is that the amounts of expenses which contribute to the income from the class (C) item are to be excluded from that income in arriving at the amount available for attribution to other years. General and administrative expenses fall within this category. Although petitioner has made no computation of these amounts, they will be computed in the same manner as it computed the selling expenses, which it agrees form a part of the deduction under the above section.[21] That is, the amount of the selling, general, and administrative expenses will be taken to apply to the class (C) items in the same proportion that the net sales of the items bear to the total net sales of the corporation.

The computation of net abnormal income and of the items of net abnormal income as required by Regulations 112, sec. 35.721-1(a) and (b), is an arithmetical one which need not be detailed here.

---

[20] Petitioner includes advertising, commissions, and freight out as selling expenses.

[21] Administrative and general expenses are stipulated. They are made up of the following accounts: Salaries and wages, traveling, telephone and telegraph, office supplies and expense, professional services, contract termination expense[1], advertising, commissions, freight out, taxes, depreciation, and miscellaneous.

[1]Appears in 1945 only.

It is next necessary to determine the amount of net abnormal income attributable to improvement in business conditions. Regs. 112, sec. 35.721–3.[22] Petitioner admits that a part of its net abnormal income is the result of an improvement in business conditions due to increased wartime demand. In many of the cases decided under section 721 it has been possible to determine the business improvement factor by using an index derived from industry statistics [23] or based on sales of the taxpayer's non-class (C) products.[24] Here, petitioner placed in evidence statistics from which it develops five indices for measuring business improvement.[25] Respondent contends that a sixth index should be used.[26] We have examined the proposed indices with care and have concluded that none of them are reliable enough to use.[27] On brief petitioner points out that it has "submitted to the Court all available statistics on every possible basis" to show what the business improvement index should be.

While we believe that some of petitioner's class (C) items "would have attracted increased sales interest without the benefit of a wartime demand," [28] we also believe, and petitioner admits, that a portion of its net abnormal income was due to an improvement in business conditions. In the absence of a reliable index we have exercised our best

[22] Regulations 112, sec. 35.721–3, provide, in part:

To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for * * * the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years * * * solely because of an improvement in business conditions.

[23] See, e.g., *W. B. Knight Machinery Co.*, 6 T.C. 519.

[24] See, e.g., *Rochester Button Co.*, 7 T.C. 529.

[25] These indices are: (1) Sales of three of petitioner's "standard" products; (2) Electrical Manufacturer's Association statistics of total sales of end products made by all electrical manufacturers; (3) War Production Board figures showing total sales for capacitors and resistors; (4) Electronics Industries Association statistics showing total sales of capacitors and resistors; (5) Internal Revenue Service published sales figures for electrical apparatus.

[26] Respondent argues that the total sales of petitioner and its two closest competitors, Cornell-Dubilier and Aerovox provide the most reliable measure of increased demand.

[27] The indices are unreliable because of their content. (1) An index based on petitioner's "standard" products entails the basic assumption that they were subject to the same demand factors as the class (C) products. Sprague testified that during the years in question petitioner was producing some of its standard products at a loss as an accommodation to its regular customers. This would tend to distort the index. In addition, electrolytic condensers form a substantial portion of what petitioner calls its "standard" products. We have concluded that electrolytic condensers are class (C) items. (2) The Electrical Manufacturer's Association statistics show total sales for end products of the entire electrical industry and are too broad a measure for petitioner's narrower and more specialized industry. (3) The War Production Board sales figures for capacitors and resistors are unacceptable because they are incomplete. Sales are shown only for 1939, 1944, and 6 months of 1943 and 1945. (4) The Electronics Industries Association capacitor and resistor sales figures are also incomplete. They include only the years 1939, 1943, 1944, and 1945. (5) The Internal Revenue Service statistics do not include a uniform range of products in all years. (6) Respondent's index is based on petitioner's sales and those of two of its competitors. By including petitioner's own sales respondent's index in part uses the abnormal as a measure of the normal. In addition, we know nothing about the components of the competitors' sales figures.

[28] *Ohio Machine Tool Co.*, 18 T.C. 330, 336.

judgment based on the record as a whole to arrive at the percentages we believe should be applied in reducing petitioner's net abnormal income to exclude the portion arising as a result of improvement in business conditions. *Cohan* v. *Commissioner*, 39 F. 2d 540; *Pantasote Leather Co.*, 12 T.C. 635. We have set these percentages forth in our Findings of Fact.

The reduction of net abnormal income of each class (C) item to exclude the amount attributable to business improvement is an arithmetical process and need not be detailed here.[29]

In addition to the general reduction of net abnormal income to exclude the portion thereof attributable to war-induced demand or improved business conditions (ranging from 50 to 65 percent), discussed above, respondent argues that three [30] items of net abnormal income were "exclusively attributable to the war-induced increase in demand" and that a fourth [30a] "had its origin in war-induced developments" and hence its net abnormal income "was also exclusively attributable to conditions brought about by the war." Relying on *Breeze Corporations, Inc.*, 16 T.C. 587, respondent concludes that none of the net abnormal income of these items is attributable to prior years. In *Breeze Corporations*, the class (C) product was *both* developed exclusively for and manufactured exclusively for the Government's war program. We said that the growing demand of the Government was the "initial cause of the research so that the income is seen as attributable throughout to increased demand" (16 T.C. at 597) and denied the taxpayer's claim.

It is respondent's argument that it was the war alone that gave rise to both the research and the demand for sale. If correct, this would, under *Breeze Corporations, Inc., supra*, eliminate completely the net abnormal income of the four class (C) items. We set forth respondent's arguments as to these four items below.

*Vitamin Q condensers.*—Respondent contends that no part of this item of net abnormal income can be attributed to taxable years prior to 1942 because, even if it is assumed that petitioner had completed its development of this item in 1940 as it alleges, it "is apparent that the proximate cause" of the income from this item was the "war-induced" decision of several domestic oil companies to manufacture polyisobutylene of the required molecular weight, a vital ingredient.

Because one of the elements of the product was not commercially obtainable prior to the war, it does not follow that the war-caused availability of the element in turn was the proximate cause of the

---

[29] Our adjustments to gross profit under *Ramsey Accessories Manufacturing Corporation*, 10 T.C. 482, and to net abnormal income to take business improvement into account are intended to include all adjustments required by Regulations 112, sec. 35.721–3, which are not otherwise specifically mentioned herein.

[30] Filters, networks, and Selkar.

[30a] Vitamin Q condensers.

demand for it, subsequently satisfied by sales which generated abnormal income. Respondent relies on the testimony of one of petitioner's witnesses who testified:

[In May 1941] we had no market for [Vitamin Q condensers]. The condensers could have been used where lesser condensers were being used, but there was no demand we knew of at the time calling for the quality we had.

In *Ohio Machine Tool Co.*, 18 T.C. 330, 336, we said: "All of petitioner's increased income cannot be attributed to improved business conditions without regard to the effects of petitioner's research and development." Such is also the case here. The Vitamin Q condenser was ready to be sold when the war arrived. This is not the situation of *Breeze Corporations, Inc., supra,* in which the research itself was war induced. We hold that the net abnormal income from Vitamin Q condensers was not "exclusively" attributable to a war-induced increase in demand. However, part of such income was, and it has been taken into account and excluded by the reduction under the business improvement factor, above.

*Filters.*—Respondent argues that no part of the net abnormal income of this item is attributable to prior years. He contends that even though the record shows petitioner began production of filters in July 1939, it is impossible to ascertain whether such production required antecedent research and development on petitioner's part, because the testimony offered by petitioner related exclusively to the development of an interference analysis package. He contends that the filters produced by petitioner in 1942 were entirely different from those produced by it in prior years, and from this concludes that the filter item was entirely the result of war demand and not attributable to prior years, or that if some part of the filter item was attributable to the petitioner's research and development, such research and development related to the interference analysis kit and cannot be attributed to the military filters sold during the years in question. The record does not support these arguments. Without detailing the evidence involved, suffice it to say that we are satisfied that the filters which petitioner produced and sold during the years in question were directly related to those which petitioner offered for civilian purposes prior to the war. Some changes may have been made to adapt the filter component kits which petitioner sold before the war to specific applications for military uses, but these were minor ones. We hold the net abnormal income from filters was not "exclusively attributable" to war-induced increase in demand.

*Networks.*—Respondent argues that this item of net abnormal income was exclusively attributable to war-generated demand, citing *Breeze Corporations, Inc.,* 16 T.C. 587. He points out that while petitioner has offered some evidence of prewar development work on

energy storage condensers for use in automobile ignition systems and percussion welding apparatus, there is no evidence of any prewar research or development work by the petitioner on networks as such. Petitioner nowhere [31] answers this argument directly, but in requesting findings of fact, it has emphasized the research that it did on energy storage condensers, which, it explains, are the "most important single item going into networks." Petitioner further requested findings of fact which would show that its research led to products suitable for use in ignition and percussion welding applications. It then points out that on two occasions it was able to produce *networks* on very short notice as a result of its prior research on energy storage condensers: First, for the Canadian-British radar program sometime in 1941 and then, in March of 1942 for the Massachusetts Institute of Technology Radiation Laboratory for a radar device. Petitioner's witness as to the first point testified somewhat vaguely. We think it a fair analysis of his testimony that the products first received by the Canadian-British program were capacitors, not networks as such.[32] In addition, petitioner's stipulated net sales figures show no sales of networks until 1942.[33] In the second instance, petitioner points out that in 1942 they were able to assemble a network out of existing components for the Massachusetts Institute of Technology in a very short time and later went into extensive production of networks.

Petitioner claims net abnormal income on the basis of sales of networks. The evidence shows that the networks (depending on the use to which they were to be put) consisted of a number of components such as capacitors, choke coils, insulators, and tubes, assembled in a metal container having a number of terminals. Petitioner's evidence shows only that it did prewar research on capacitors which were components (although perhaps the most important components) of the networks. Petitioner's sales of networks in the years 1942 through 1945 were derived primarily from networks used in radar which was developed during these years. The record shows that the networks from which petitioner derived net abnormal income were developed exclusively for the Government, and that the demand for

[31] Respondent first put forth this argument in his original brief. Thereafter, petitioner filed two reply briefs and an extensive exception to the findings of the commissioner.

[32] The witness testified: "We [the Canadian-British program] had produced these devices [air transportable early warning radar] on a 'crash' program, but had failed to take into full account the extreme conditions which would take place in North Africa, [the British North African Campaign began in earnest about February 1941; the battle for El Alamein began August 31, 1942, the Allied landing in North Africa was in November 1942 and the Axis were defeated there about May 1943. Shirer, The Rise and Fall of the Third Reich, pp. 827, 919, 923, 925, (Simon and Schuster 1960)] and we had to call upon the Sprague Company to provide us with *capacitors* which would withstand extremely high temperatures, and we knew * * * that they did have a product which could be adapted to our particular requirement." (Emphasis added.)

[33] Petitioner explains on brief that "sales of network condensers as separate components" were carried in other accounts prior to 1942. The record seems to support this explanation.

networks was created solely by the Government's wartime interest in radar. Thus, under the rule of *Breeze Corporations, Inc., supra,* and under the provisions of Regulations 112, sec. 35.721–3, no amount of the net abnormal income generated by this item is attributable to other years.

Further, even if this item of net abnormal income does not come within the rule of the above authorities, petitioner has failed in its burden of proof as to it. The record shows no more than that the research and development of prior years was directed solely to the research and development of the capacitor component of networks.[34] Petitioner has failed to show that the *networks* of the type sold during the years in question resulted from its research and development of prior years, or that it did research and development on *networks* for a period in excess of 12 months at least insofar as the first several of the years in question are concerned. Sec. 721(a)(2)(C). Petitioner has made no attempt to separate from the network sales the amounts attributable to the capacitors which were possibly the main component of networks, if indeed such a breakdown would be possible, and there is nothing in the record which would provide any basis for our doing so. Accordingly, none of the net abnormal income from networks is attributable to any prior years.

*Selkar-Prokar condensers.*—Respondent argues that the Selkar condenser was developed and sold solely for use in weapons systems and in the proximity fuse of Howitzer and antiaircraft shells, and as such comes within the rule of *Breeze Corporations, Inc., supra.* We agree. Petitioner claims that the research program which resulted in Selkar was begun long before the war;[35] that the research program was directed toward providing a product for the civilian market; and that "Under these circumstances" *Breeze Corporations, Inc., supra,* is "completely inapplicable." As our findings of fact show, petitioner's prewar research dealt with impregnants for cellophane dielectrics. While some of the general benefit of this research undoubtedly carried over, Selkar and Prokar themselves were developed for Navy purposes and sold only to it. If it appears that "any items of net abnormal income in the taxable year are the result of * * * increased physical volume of sales due to increased demand for * * * the type of product sold by the taxpayer"[36] the resulting amount of net abnormal income is excluded. Thus, even though the item of net abnormal income had existed in some form prior to the taxable years,

---

[34] Petitioner argues on brief: "The entire question of networks does not involve the development of networks by petitioner. * * * networks * * * were 'widely known' and 'old in the art.' What the petitioner developed in connection with networks were the *condensers* that went into them."

[35] Petitioner alleges that the research on Selkar components began in 1929 at one point and 1932 at another point.

[36] Regs. 112, sec. 35.721–3.

if the sale of the item during the taxable years is wholly the result of increased physical volume of sales due to increased demand, none is attributable to prior years. *Breeze Corporations, Inc., supra.* Compare *Pantasote Leather Co., supra.* Such is unquestionably the case here. Petitioner in its petition states:

> On November 10, 1944, the petitioner entered into a contract * * * with the United States Navy for the manufacture of 3,000,000 Selkar annular condensers * * *. Such special condensers had no sales value to anyone except the United States Navy.

We think the record shows this statement equally apt as to all the Selkar-Prokar condensers sold by petitioner during the years in question. No part of this item of net abnormal income is attributable to prior years.

The next question is attribution of net abnormal income to prior years. Net abnormal income arising from research and development is to be attributed to the several years to which it relates on the basis of the amount of research and development which took place in each year.[37] In general, petitioner's position is that the bulk of the research and development was completed prior to 1939. Respondent contends that a great deal of research and development was done on class (C) items during the war years.

Petitioner has estimated its total cost of research and development for each of the years 1936 through 1945.[38] On the basis of these estimates, petitioner has allocated about 90 percent of the research and

---

[37] Regulations 112, sec. 35.712–7 provide, in part:

In general, an item of net abnormal income of the class described in this section is to be attributed to the taxable years during which expenditures were made for the particular * * * research, or development which resulted in such item being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures. Allocation of items of net abnormal income of the class described in this section must be made according to the principles set forth in section 35.721–3.

[38] The following example for the year 1938 will illustrate petitioner's method of arriving at its estimates of research and development costs. The stipulated income statement shows an item entitled "Research and Experimental" cost for the year 1938 in the amount of $22,384.22. Petitioner introduced evidence taken from its books which shows that the labor for all research for 1938 was $13,514.40, and that the cost of the materials used in all petitioner's research was $8,869.82 for that year. Robinson, petitioner's director of research, estimated the total number of hours each employee of the research department spent on each of the products in 1938, which petitioner now considers class (C) items. This estimate was made on the basis of laboratory notebooks kept by the research personnel and Robinson's own knowledge. To each researcher's total hours of research on each item, Robinson then applied the hourly wage rate for that person in 1938 to arrive at the cost of research labor for each item. This cost was then multiplied by 65.63 percent, the percent of materials to labor of petitioner's research program as a whole in 1938, above, to give estimated material cost for each item for that year. The estimated material cost and the estimated labor cost were then totaled to arrive at the total estimated cost of research. For the year 1938 this amount was $11,568.61.

To this amount petitioner added the cost of processing patents which it considered related to the items in question. The patent cost was arrived at by estimating the proportion of the total salaries paid patent counsel and peitioner's internal patent personnel which applied to the items petitioner considered its class (C) products. In 1938

development of its class (C) items to the years 1936 through 1939.[39]

Respondent admits petitioner's figures for research cost for the years 1936 to 1939, inclusive, should be accepted as showing the maximum amounts expended for such research in said years. As will later appear, we feel the record warrants a slight downward adjustment of some of petitioner's figures and an allocation of patent expenses (which petitioner only shows in total amounts) to the separate items. However, respondent argues that petitioner's reconstruction is incomplete in that it does not show continued, relevant research and development which respondent alleges petitioner undertook during the period from 1941 through 1945. To support his allegation respondent relies on patent applications, estimates of the research and development which preceded the patent applications, research and development activities that followed the patent applications based on laboratory notebooks, representations by petitioner of wartime research and development contained in briefs filed with the Signal Corps for renegotiation purposes, in the minutes of a directors meeting and in a stock prospectus.

Respondent presented evidence of the petitioner's wartime patent developments through Lavender, a witness well qualified as an expert in both the electronics and patent law fields. Lavender testified that he had thoroughly examined Patent Office files. From these files and from the face of the patents and patent applications in them, he testified that in his opinion the patent applications which we have set forth in our Findings of Fact related to some of the class (C) items which are in issue.

Petitioner has presented no evidence at all on this point. It first argues that these patents and applications have "nothing to do with the products" in question and so have no relevancy to the case. While petitioner contends that (with the exception of Selkar) all of the products in question were in production by 1939, and inferentially, because of this there was no need for research and development there-

---

petitioner's computation related $101 of the said salaries (which totaled $6,312 in 1938) to items in question.

Thus the total amount claimed by petitioner as research and development costs applicable to items in question is $11,669.61 for 1938.

By this form of computation (with some adjustments as to several years, not detailed here) petitioner's reconstruction of the total cost of its research and development is as follows:

| Year | Research and development costs applicable to new products | Year | Research and development costs applicable to new products |
|------|------|------|------|
| 1936 | $3,222.53 | 1942 | $614.42 |
| 1937 | 8,185.43 | 1943 | 1,229.59 |
| 1938 | 11,669.61 | 1944 | 670.00 |
| 1939 | 12,078.25 | 1945 | 945.00 |
| 1940 | 1,234.82 | | |
| 1941 | 169.59 | Total | 40,019.24 |

[39] Petitioner's estimates do not include figures for electrolytic condensers nor is there a breakdown between mineral oil, castor oil, and Vitamin Q condensers. See our discussion above.

after, it admits that patent application Nos. 496,978, 434,121, 576,074, and 572,993 on resistors and No. 559,458 on transmitting mica condensers should be included as wartime research and development. Yet both resistors and transmitting mica condensers according to its argument were in production by 1939. It would, therefore, seem that this first contention has scant weight.

Petitioner's only other argument against the use of the patents and patent applications to show wartime research is that—

the patents and applications, *on their face,* demonstrate that they have nothing at all to do with the Sec. 721 products in issue herein and in most cases were never used in any product during the years in question or thereafter. * * *

The patents and patent applications deal with highly complex electronic components of different varieties. Respondent's expert witness, Lavender, selected these applications because in his opinion it appeared from his examination of their face that they covered things which could have been used in or in connection with the products which are in issue here.

Whether or not they were used in the products in question is a question of fact to be resolved like any other such question. The patents or patent applications show on their face (to one skilled in the use of the highly technical terminology involved) the use for which they were designed and the use in which *others* are prohibited from using them. The patents and patent applications in no way limit the use to which the patent holder (in this case the petitioner) could put the device, nor do the documents show on their face that the device was never used or whether it was used; if used, how it was used, or in what products it was used.

The patent applications and the record as a whole clearly demonstrate wartime research by petitioner relating to several of the class (C) items. We believe that respondent, through Lavender, has presented good evidence which puts on petitioner the burden of going forward. It has attempted to meet this burden only by arguing that the patent applications themselves show the devices to which they refer were related neither to the items in issue nor to the abnormal income in issue. They are insufficient to do so. We accept the patent applications and patents as evidence of continued research and development on the part of petitioner during the several years to which they relate.

We do not believe it necessary that these patents be shown by respondent to be directly productive of net abnormal income. Petitioner argues, and we have found as a fact, that most of the class (C) items were in production by 1939. In our view these wartime patents are evidence of continuing research and development to keep pace with, or to lead, developments in the field. Sprague testified that petitioner's management considered continuing research and de-

velopment vital to improve its marketable products. We do not believe that the petitioner would contend that all of its estimated pre-1940 research and development expenditures were productive of usable results as to the items in question. In the process of research, even the failures may be productive if only by narrowing the field for future efforts. The same standards should apply to the wartime research as to the prewar research expenditures. In the present state of the record it is clear that there was patent activity during the years in question at least as great as during the 1936 to 1939 period. Respondent has sufficiently related this activity to the items in question. If petitioner wished to show that none of it related to the items in issue, it was open to it to choose an effective way to do so. It has not done so.

The next problem is to determine the quantum of such research as compared with that prior to the years in question. Respondent uses the patent applications as a starting point from which to estimate petitioner's wartime research costs for the class (C) items.[40] His reconstruction uses evidence of research labor costs relating to some of the patent applications (evidence as to all was not available), a proportional allocation of research material cost and evidence of some of the charges of petitioner's patent counsel for work on some of the applications (again, evidence as to all was not available). For the patent applications for which no evidence of research labor or patent costs appears, respondent has used averages derived from the known costs.[41] This method of estimating research expenses is not unlike that adopted by petitioner to show research costs in prewar years which, as stated earlier, respondent practically accepts.

Because petitioner contends that there was almost no research in connection with the class (C) items during the years 1941 through 1945, in none of its 547 pages of briefs has it given the Court the benefit of answering any of respondent's contentions with respect to his method of estimating wartime research costs. We have studied the record with great care. Taking into account that all of the facts on which respondent relies for his estimates are peculiarly within the realm of petitioner's knowledge, we have carefully considered, *inter*

---

[40] As appears from this opinion, the net abnormal income of six class (C) items is eligible for allocation to prior years: Mineral oil, castor oil, and Vitamin Q condensers, transmitting mica condensers, resistors, and filters.

[41] Respondent's computation of research and development costs using this method is as follows:

| Item | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|---|
| Resistors | $844.56 | $4,518.64 | $4,675.94 | $12,796.18 | $9,701.10 | $4,245.26 |
| Transmitting mica condensers | 61.64 | 10,554.88 | 10,554.87 | 10,554.87 | 10,554.87 | 0 |
| Vitamin Q condensers | 434.80 | 751.34 | 1,502.74 | 1,624.95 | 647.32 | 701.78 |
| Castor oil condensers | 434.80 | 0 | 299.82 | 659.82 | 839.64 | 0 |
| Mineral oil condensers | 434.80 | 321.80 | 1,012.46 | 1,087.53 | 844.64 | 676.78 |
| Filters | 0 | 0 | 0 | 0 | 0 | 0 |

*alia*, the assumptions on which respondent's method is based, the application of this method to the evidence presented and to the facts of this case, the amount of estimated costs allocated to the period prior to and after the filing dates of the applications, the patent applications filed in 1946, the infirmities in respondent's use of the minutes of a directors meeting authorizing the appropriation of $50,000 for research on transmitting mica condensers to show research costs, similar infirmities in respondent's use of a Signal Corps research contract and a stock prospectus, and the fact that Robinson's testimony effectively precludes the use of the bypass condenser patent to show research and development.

We have accepted and used respondent's method of estimating research costs for the years 1940 through 1945, subject to modifications called for by the considerations set forth above. As stated earlier respondent raises no serious objection to petitioner's estimates of its prewar research costs and we have accepted them for the years 1936 through 1939 with some slight modifications called for by the record. On the basis of the record presented and in the exercise of our best judgment we have found petitioner's costs of research and development of the class (C) items for each of the years 1936 through 1945 and have set them forth at the end of our Findings of Fact.

Petitioner has shown no evidence from which the cost of research and development of electrolytic condensers can be found. Therefore, no part of that item of net abnormal income is attributable to other years. Sec. 721 (b) ; Regs. 112, sec. 35.721–3.

Regulations 112, sec. 35.721–3,[42] require that the attribution to prior years is to be on the basis of *items* of net abnormal income. Petitioner's computation of the amounts attributable to prior years seems to have been made on the basis of total class (C) net abnormal income. In the Rule 50 computation the parties will follow the method outlined in the regulations.

Petitioner also has pending before this Court a petition for review

---

[42] Regulations 112, sec. 35.721–3, provide, in part, as follows :

AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin. * * * To the extent that any items of net abnormal income in the taxable year are the result of high prices * * * such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years * * * solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to * * * demand for the product. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, * * * contributing to the production of such income.

of the denial of its claims for relief under section 722.[43]  Respondent argues that if any portion of the claimed constructive increase in base period income is allowed under section 722, duplication of relief would occur by permitting attribution to the base period of part of the net abnormal income determined in this case, and that section 721(f) [44] should be now applied to bar possible duplication of relief.  The short answer to this contention is that no question dealing with section 722 is now before us.  Section 721(f) has no application to any issue dealing with the section 721(a)(2)(C) relief with which this case is solely concerned.  We, therefore, do not consider it.  See *Primas Groves, Inc.*, 15 T.C. 396.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

[43] Docket No. 37675.
[44] SEC. 721.  ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(f) ABNORMAL INCOME FROM EXPLORATION, ETC.—If by reason of taking into account, in determining constructive average base period net income under section 722, exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months, such constructive average base period net income is higher than it would be without such taking into account, only such portion of the income in the taxable year resulting from such activity which is of a class described in subsection (a)(2)(C) as is attributable to another taxable year under this subchapter shall be deemed attributable to a year other than the taxable year.